# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 14, 2011         Decided May 17, 2011

No. 10-5078

MARY BROOKE OBERWETTER,
APPELLANT

v.

KENNETH HILLIARD, U.S. PARK POLICE, AND KENNETH LEE
SALAZAR, SECRETARY, U.S. DEPARTMENT OF INTERIOR,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-00588)

*Alan Gura* argued the cause for appellant. With him on the briefs was *Candice N. Hance*.

*Harry B. Roback*, Assistant U.S. Attorney, argued the cause for appellees. With him on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: ROGERS, TATEL, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: Late on the eve of the 265th birthday of Thomas Jefferson—Author of the Declaration of American Independence, of the Statute of Virginia for Religious Freedom, and Father of the University of Virginia—Officer Kenneth Hilliard of the United States Park Police arrested plaintiff Mary Brooke Oberwetter when she refused to stop what she describes as "silent expressive dancing" inside the Jefferson Memorial. She filed suit against Hilliard and the government alleging violations of her First and Fourth Amendment rights. The district court dismissed her complaint. For the reasons that follow, we affirm.

I

At quarter to midnight on April 12, 2008, Oberwetter and seventeen friends entered the Jefferson Memorial to "celebrate and honor the former President . . . by ushering in his birthday with silent dance."[1] Appellant's Br. 4. According to Oberwetter, the dancing expressed admiration for Mr. Jefferson's political legacy. "In the individualist spirit for which Jefferson is known, the dancers danced for the most part by themselves, in place, each listening to his or her music on headphones." Compl. ¶ 13. The dancing took place inside the Memorial, a circular structure with a domed roof and colonnaded perimeter. "Apart from [Oberwetter] and her associates, and employees of the National Park Service, there

---

[1] For his part, Mr. Jefferson is on record discouraging celebration of his birthday. "On Mr. Jefferson's accession to the Presidency [visitors] had waited on him, requesting to be informed, which was his birthday, as they wished to celebrate it with proper respect. 'The only birthday I ever commemorate,' replied he, 'is that of our Independence, the Fourth of July.'" THE FIRST FORTY YEARS OF WASHINGTON SOCIETY 398 (Gaillard Hunt ed., Scribner's Sons 1906).

were very few visitors to the Jefferson Memorial at the time of the dancing." *Id.* ¶ 15.

A group of United States Park Police officers ordered the dancers to disperse. Oberwetter states that she did not immediately comply but removed a headphone from one ear and asked Officer Hilliard "why he was ordering her to leave, and what law she was violating." *Id.* ¶ 18. Hilliard offered no explanation, but continued to insist that she stop dancing and leave immediately. Rather than complying, Oberwetter again asked Hilliard to "provide a lawful reason why she needed to do so," but he "refused to offer any reason whatsoever for his demands, and instead arrested [her]." *Id.* ¶ 19. Oberwetter further alleges that Hilliard "used more force than was necessary . . . , ripping apart her earbud, shoving her against a pillar, and violently twisting her arm." *Id*. ¶ 21. The Park Police took her into custody for some five hours of processing, after which they cited her for "[i]nterfering with an agency function" in violation of 36 C.F.R. § 2.32 (prohibiting "[t]hreatening, resisting, intimidating, or intentionally interfering with a government employee or agent engaged in an official duty, or on account of the performance of an official duty").

Three days later, Park Police officers visited Oberwetter's home and gave her two superseding citations—one for "interfering with an agency function," and another for "[d]emonstrating without a permit" in violation of the National Park Service Regulations. *See* 36 C.F.R. § 7.96(g)(3)(ii)(C). On May 21, 2008, Oberwetter appeared before the district court to defend the charges. According to her complaint, the court found that "the prosecution . . . was not properly before the Court and advised . . . Hilliard that if he wished to proceed, he would have to properly prepare the

matter for hearing." Compl. ¶ 25. The Park Police have not pressed the matter since.

Oberwetter subsequently filed this suit, arguing that Hilliard's enforcement of the Park Service Regulations to prohibit her expressive dancing violated her First Amendment rights to free speech and assembly. She sought injunctive and declaratory relief, stating that she "would again silently dance at the Jefferson Memorial to commemorate Thomas Jefferson's birthday, by herself, and with other like-minded people, but refrains from doing so because she reasonably fears arrest, prosecution, fine, and/or incarceration if she were to do so again." *Id.* ¶ 26. She also brought three *Bivens* claims for money damages against Hilliard in his personal capacity, alleging violations of her First and Fourth Amendment rights.

The district court dismissed Oberwetter's complaint for failure to state a claim, holding that she was lawfully arrested for violating the reasonable regulations that govern the Jefferson Memorial, a nonpublic forum reserved for the tranquil commemoration of Mr. Jefferson's legacy. *Oberwetter v. Hilliard*, 680 F. Supp. 2d 152 (D.D.C. 2010). The court further held that Hilliard had probable cause to make the arrest, and that he used reasonable force to subdue Oberwetter without injury after she twice refused his lawful orders. We take jurisdiction pursuant to 28 U.S.C. § 1291, reviewing the district court's dismissal de novo. *See Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1108 (D.C. Cir. 2008). In reviewing a dismissal for failure to state a claim, "we must treat the complaint's factual allegations as true, must grant [the] plaintiff the benefit of all reasonable inferences from the facts alleged, and may uphold the dismissal only if it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would

entitle [her] to relief.” *Shea v. Rice*, 409 F.3d 448, 450 n.2 (D.C. Cir. 2005) (citation omitted).

## II

As a threshold matter, Oberwetter contends that the National Park Service misread its own regulations in treating her expressive dancing as unlawful. Ordinarily, we “accord an agency’s interpretation of its own regulations a high level of deference, accepting it unless it is plainly wrong.” *Howmet Corp. v. EPA*, 614 F.3d 544, 549 (D.C. Cir. 2010) (internal quotation marks omitted). Here, however, because the Park Service’s interpretation of its regulations could lead to criminal sanctions against Oberwetter, our deference is constrained by the need to ensure that she had fair warning. *See United States v. McGoff*, 831 F.2d 1071, 1077 (D.C. Cir. 1987) (“In the criminal context, courts have traditionally required greater clarity in draftsmanship than in civil contexts, commensurate with the bedrock principle that in a free country citizens who are potentially subject to criminal sanctions should have clear notice of the behavior that may cause sanctions to be visited upon them.”); *see also Rollins Envtl. Servs., Inc. v. EPA*, 937 F.2d 649, 654 (D.C. Cir. 1991). We are satisfied that the Regulations give fair notice that expressive dancing is prohibited inside the Jefferson Memorial.

The Regulations provide that, within the park areas of the National Capital Region, “[d]emonstrations and special events may be held only pursuant to a permit . . . .” 36 C.F.R. § 7.96(g)(2). “Demonstrations” include:

> picketing, speechmaking, marching, holding vigils or religious services and all other like forms of conduct which involve the communication or expression of views or grievances, engaged in by one or more persons, the

conduct of which has the effect, intent or propensity to draw a crowd or onlookers. [The] term does not include casual park use by visitors or tourists which does not have an intent or propensity to attract a crowd or onlookers.

*Id.* § 7.96(g)(1)(i).[2]

Oberwetter argues that her silent expressive dancing was not a demonstration because it was not "like" the enumerated activities of "picketing, speechmaking, marching, [or] holding vigils or religious services." *Id*. § 7.96(g)(1)(i). Unlike those examples, she argues, her expressive dancing was not an "organized group activity in which a uniform message is passionately conveyed." Appellant's Br. 15. She further claims that her conduct falls within the exception for "casual park use." *Id.* Dancing silently in place while listening to headphones, she says, is something that people do in the course of ordinary activity—waiting for the bus, standing on the sidewalk, etc.—and does not have the "effect, intent or propensity to draw a crowd or onlookers." 36 C.F.R. § 7.96(g)(1)(i).

The district court properly rejected Oberwetter's arguments. Under the Park Service Regulations, a demonstration need not be an "organized group activity," but may consist of "one or more persons." *Id.* Oberwetter's expressive dancing falls within the spectrum of examples of prohibited activities, which range from "the boisterousness of picketing or speechmaking to the quiet solicitude of a vigil."

---

[2] On January 3, 2011, the Park Service issued a notice of proposed rulemaking that "would revise the definition of demonstration at 36 C.F.R. 7.96(g)(1)(i) by eliminating the term 'intent or propensity' where it appears in the definition and replace it with 'reasonably likely.'" 76 Fed. Reg. 57, 57.

*Oberwetter*, 680 F. Supp. 2d at 161. Although silent, Oberwetter's dancing was a conspicuous expressive act with a propensity to draw onlookers. True, it occurred close to midnight on a weekend, making it less likely that a crowd would gather. But the question is not whether her dancing was likely to attract attention at that particular time. As with the other prohibited activities of "picketing, speechmaking, marching, [and] holding vigils or religious services," expressive dancing might not draw an audience when nobody is around. But the conduct is nonetheless prohibited because it stands out as a type of performance, creating its own center of attention and distracting from the atmosphere of solemn commemoration that the Regulations are designed to preserve.

Taking another tack, Oberwetter argues that even if she engaged in a demonstration inside the Memorial, she was free to do so because her group of silent dancers was never larger than 18 people. The Regulations allow for groups of 25 or fewer to demonstrate without a permit "provided that the other conditions required for the issuance of a permit are met." 36 C.F.R. § 7.96(g)(2)(i) (emphasis omitted). She admits, as she must, that the Regulations state that "[n]o permits may be issued authorizing demonstrations or special events in . . . [t]he Jefferson Memorial, which means the circular portion of the Jefferson Memorial enclosed by the outermost series of columns, and all portions on the same levels or above the base of these columns, except for the official annual commemorative Jefferson birthday ceremony." *Id.* § 7.96(g)(3)(ii). But, she argues, this is not a "condition" required for the issuance of a permit. In her view, there are no conditions at all for the issuance of a permit for demonstrations inside the Memorial, and so groups of 25 or fewer must be allowed to demonstrate there.

This argument can be readily rejected. As the district court rightly observed, the much more natural reading of the

Regulations is that being outside of the Memorial is a required condition for any demonstration, meaning that, aside from the official birthday ceremony, no demonstrations of any size are allowed inside the Memorial.

## III

The heart of Oberwetter's complaint is her claim that the First Amendment protects her right to engage in silent expressive dancing inside the Jefferson Memorial.[3] Because the First Amendment "affords protection to symbolic or expressive conduct as well as to actual speech," *Virginia v. Black*, 538 U.S. 343, 358 (2003), there is no question that she had the right to dance in order to express her admiration for Mr. Jefferson. Of course she did. But the question this case presents is whether she had the right to perform her dance inside the Jefferson Memorial.

We analyze Oberwetter's claim under the familiar "public forum" doctrine, which divides government property into three categories for purposes of First Amendment analysis. The "traditional public forum" includes public areas that have "by long tradition or by government fiat . . . been devoted to assembly and debate." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). The government must respect the open character of these forums, and can only impose speech restrictions that are "narrowly tailored to serve a significant governmental interest." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Next is the "limited public forum" or "designated public forum," which comprises "public property which the State has opened for

---

[3] Because Oberwetter brings an as-applied rather than a facial challenge, we do not address whether the Regulations could survive a challenge on grounds of substantial overbreadth. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008).

use by the public as a place for expressive activity." *Perry*, 460 U.S. at 45. Expressive activity in these forums may be restricted to particular speakers or purposes. Third is the "nonpublic forum," which encompasses government property that is "not by tradition or designation a forum for public communication." *Id.* at 46. Here the government "may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* This rule recognizes that "[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Greer v. Spock*, 424 U.S. 828, 836 (1976) (quoting *Adderley v. Fla.*, 385 U.S. 39, 47 (1966)) (internal quotation marks omitted).

"The dispositive question is not what the forum is *called*, but what *purpose* it serves, either by tradition or specific designation." *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 515 (D.C. Cir. 2010). We begin by analyzing the property in this case "at a very high level of generality," adopting "a working presumption that sidewalks, streets and parks are normally to be considered public forums." *Henderson v. Lujan*, 964 F.2d 1179, 1182 (D.C. Cir. 1992). We then examine the history and characteristics of the particular property at issue, mindful "that when government has dedicated property to a use inconsistent with conventional public assembly and debate . . . then the inconsistency precludes classification as a public forum." *Id.*

The district court properly concluded that the area inside the Jefferson Memorial is a nonpublic forum. As a general matter, the interior space of national memorials has not traditionally "been used for purposes of assembly, communicating thoughts between citizens, and discussing

public questions." *Perry*, 460 U.S. at 45 (quoting *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939)) (internal quotation marks omitted). National memorials are places of public commemoration, not freewheeling forums for open expression, and thus the government may reserve them for purposes that preclude expressive activity. Oberwetter points out that the Jefferson Memorial is located within the National Park system, and that public parks are quintessential examples of traditional public forums. *See id.* Even so, we have recognized that our country's many national parks are too vast and variegated to be painted with a single brush for purposes of forum analysis. "Presumably, many national parks include areas—even large areas, such as a vast wilderness preserve— which never have been dedicated to free expression and public assembly, would be clearly incompatible with such use, and would therefore be classified as nonpublic forums." *Boardley*, 615 F.3d at 515; *see also Lederman v. United States*, 291 F.3d 36, 46 (D.C. Cir. 2002) (noting that "some areas within a large public forum may be nonpublic if their use is specialized") (internal quotation marks omitted); *Cmty. for Creative Non-Violence v. Watt*, 703 F.2d 586, 599 n.35 (D.C. Cir. 1983) (en banc) (plurality opinion) (observing that the Park Service "need not treat the [National Mall] as a monolithic whole"), *rev'd sub nom. on other grounds*, *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984).

In creating and maintaining the Jefferson Memorial in particular, the government has dedicated a space with a solemn commemorative purpose that is incompatible with the full range of free expression that is permitted in public forums.[4] Oberwetter alleges that visitors to the Memorial

---

[4] We are mindful that forum determinations are typically fact intensive, and that we lack a factual record here because the district court dismissed this case on the pleadings. We press ahead

regularly "talk loudly, make noise, [and] take and pose for photographs," Compl. ¶ 10, but none of this conduct rises to the level of a conspicuous "demonstration." For three-and-a-half decades, the Park Service Regulations have sought to "protect[] legitimate security and park value interests, including the maintenance of an atmosphere of calm, tranquility, and reverence in the vicinity of major memorials." 41 Fed. Reg. 12,879, 12,880 (Mar. 29, 1976). The Regulations specifically identify the interior of the Jefferson Memorial as a place where visitors may not engage in expressive activity that "has the effect, intent or propensity to draw a crowd or onlookers." 36 C.F.R. § 7.96(g)(1)(i). Visitors to the Memorial interior must ascend a stairway, traverse a portico, and pass a sign that says "Quiet / Respect Please" before entering. The Park Police patrol the area, and Oberwetter has pled no facts suggesting that they allow visitors to engage in disruptive demonstrations. Having thus created and maintained the Memorial as a commemorative site, the government is under no obligation to open it up as a stage for the roving dance troupes of the world—even those celebrating Mr. Jefferson.

That the Memorial is open to the public does not alter its status as a nonpublic forum. Visitors are not invited for expressive purposes, but are free to enter only if they abide by the rules that preserve the Memorial's solemn atmosphere. As the Supreme Court has observed, an area "is not transformed into 'public forum' property merely because the public is permitted to freely enter and leave the grounds at practically all times." *United States v. Grace*, 461 U.S. 171, 178 (1983). The government conducts an official ceremony for Jefferson's

nonetheless because the salient features of the Memorial are "generally known within [our] territorial jurisdiction" and "not subject to reasonable dispute." Fed. R. Evid. 201(b).

birthday inside the Memorial each year, but this is an instance of government speech rather than an open invitation for private speakers. It is of no moment that the Memorial was built in 1943 but not regulated by the Park Service until 1976. Oberwetter has made no allegation that the Memorial was either a traditional public forum or designated public forum before the Park Service's regulation, *see Oberwetter*, 680 F. Supp. 2d at 163, and we have made clear that a piece of government property is not automatically a public forum "merely because the government has for a time stayed its hand" in imposing restrictions. *Henderson*, 964 F.2d at 1183.

Nor is this case like *Grace*, where the Supreme Court held that the grounds surrounding the Supreme Court building could not be deemed a nonpublic forum because there was "no separation, no fence, and no indication whatever to persons stepping from the street . . . that they [had] entered some special type of enclave." 461 U.S. at 179. The physical characteristics of the Jefferson Memorial clearly delineate the nonpublic forum. The ceiling dome sits atop a circular colonnade, marking out a distinct memorial space. The clear boundaries of the Memorial also distinguish it from the restricted-speech zone in *Henderson*, which we struck down in part because it extended far beyond the Vietnam Veterans Memorial and encompassed public lawns and sidewalks that appeared "indistinguishable from ordinary sidewalks used for the full gamut of urban walking." 964 F.2d at 1182.

Having determined that the Jefferson Memorial is a nonpublic forum, we have little trouble concluding that the Park Service Regulations are "viewpoint neutral and reasonable in light of the purpose [of] the forum." *Marlin v. D.C. Bd. of Elections and Ethics*, 236 F.3d 716, 719 (D.C. Cir. 2001) (citation and quotation marks omitted). The Regulations plainly do not discriminate on the basis of

viewpoint, but rather prohibit disruptive speech regardless of its message. Oberwetter argues that the government engages in viewpoint discrimination by hosting its own official birthday ceremony in the Memorial while excluding her celebratory dance. This argument fails because the government is free to establish venues for the exclusive expression of its own viewpoint. *See Pleasant Grove v. Summum*, 555 U.S. 460 (2009) (holding that when the government erects a monument on public property, it is not obligated to allow other monuments expressing alternative viewpoints); *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005) ("[T]he Government's own speech . . . is exempt from First Amendment scrutiny."). It would be strange indeed to hold that the government may not favor its own expression inside the Jefferson Memorial, which was built by the government for the precise purpose of promoting a particular viewpoint about Jefferson.

We have noted previously that the Park Service has a substantial interest in promoting a tranquil environment at our national memorials. *See Henderson*, 964 F.2d at 1184 ("Th[e] interest in maintaining a tranquil mood at the [Vietnam] Memorial wall is similar to ones that the Supreme Court and this court have recognized as substantial."). Here the government has reasonably advanced its interest in tranquility because, unlike in *Henderson*, the restriction on expressive activity does not sweep beyond the actual Memorial space. Outside the Jefferson Memorial, of course, Oberwetter and her friends have always been free to dance to their hearts' content.

## IV

Finally, we turn to Oberwetter's claims against Officer Hilliard under *Bivens v. Six Unknown Named Agents*, 403

U.S. 388 (1971). Oberwetter alleges that Hilliard personally violated her First and Fourth Amendment rights by infringing her right to free expression, arresting her without probable cause, and subjecting her to excessive force. "Although government officials may be sued in their individual capacities for damages under *Bivens*, qualified immunity protects officials from liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Atherton v. District of Columbia*, 567 F.3d 672, 689 (D.C. Cir. 2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In evaluating a claim of qualified immunity, we first "determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of violation." *Stewart v. Evans*, 351 F.3d 1239, 1243 (D.C. Cir. 2003) (quoting *Wilson v. Layne*, 526 U.S. 603, 609 (1999)).

Hilliard's alleged conduct did not violate Oberwetter's clearly established constitutional rights. She had no First Amendment right to stage an unlawful performance inside the Jefferson Memorial, and in doing so created the cause for her own arrest. She alleges that Hilliard acted out of malice, arresting her for no good reason after she questioned his authority. But in fact her arrest was prompted not merely by her questioning Hilliard, but rather by her failure to comply with his lawful order during the course of her unlawful conduct. In any event, Hilliard's motive would not affect the existence of probable cause, which depends "on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time . . . and not on the officer's actual state of mind at the time the challenged action was taken." *Maryland v. Macon*, 472 U.S. 463, 470-71 (1985). Hilliard was objectively justified in arresting Oberwetter because he observed her breaking the law.

Oberwetter's remaining *Bivens* claim is that Hilliard violated the Fourth Amendment by using excessive force when he pulled her arm behind her back and pushed her up against a stone column during her arrest. In general, police officers have authority to use "some degree of physical coercion" when subduing a suspect, *Graham v. Connor*, 490 U.S. 386, 396 (1989), as long as the amount of force used is reasonable. In Judge Friendly's famous formulation, "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973). We determine the reasonableness of force based on "the facts and circumstances of [the] particular case, including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether [s]he [wa]s actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. Thus, for Oberwetter's claim to prevail, "the excessiveness of the force [must be] so apparent that no reasonable officer could have believed in the lawfulness of his actions." *Wardlaw v. Pickett*, 1 F.3d 1297, 1303 (D.C. Cir. 1993).

Although Oberwetter's alleged violation was far from "sever[e]," her complaint nonetheless makes clear that Officer Hilliard's use of force was not excessive. Most instructive on this point is *Wasserman v. Rodacker*, 557 F.3d 635 (D.C. Cir. 2009), where a man was forcibly arrested after refusing a police officer's request to stop and answer some questions while walking his dog in violation of a leash law. Although

the man eventually stopped and "was not moving or offering any resistance," the officer "forcefully pressed upwards on [his] arm before handcuffing him, causing him pain." *Id.* at 641. The court held that the use of force was reasonable because the man's "refusal to obey [the officer's] order prior to his arrest suggested that he might try to resist or escape." *Id.* The court also found it significant that the man "suffered no bruise or injury, which tends to confirm that [the officer] did not use more force than reasonably appeared necessary to secure [his] compliance." *Id.* (internal quotation marks omitted).

The same factors are dispositive in the present case. Oberwetter admits in her complaint that before she was arrested she twice refused Hilliard's order to stop dancing and leave the Memorial. She also admits that she was accompanied by a group of 17 other people at the time, which in our view could have caused Hilliard to be reasonably worried that events might get out of hand. This is especially true given the lateness of the hour and the unusual activity of the crowd, whose intentions he did not know. Under such circumstances it was not clearly unreasonable for Hilliard to take decisive action to subdue Oberwetter quickly and forcefully, thereby reducing the risk of interference or escape. Given that some force may have appeared reasonably necessary, Hilliard's alleged actions were not markedly different from what we would expect in the course of a routine arrest. As in *Wasserman*, the fact that Hilliard did not cause Oberwetter any serious bodily injury tends to confirm that the use of force was not excessive. *See also Wardlaw*, 1 F.3d at 1304 & n.7 (noting that while the absence of a severe injury "is not by itself the basis for deciding whether the force used was excessive, it does provide some indication" that the degree of force was reasonable).

17

In light of these considerations, we agree with the district court that Oberwetter's complaint has failed to state a sufficient claim that Hilliard's actions were beyond the pale of reasonableness as established by our case law.

V

The judgment of the district court is

*Affirmed.*