# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 7, 2017        Decided June 26, 2018

No. 16-7146

JONATHAN HEDGPETH,
APPELLANT

v.

AMMAR RAHIM, DISTRICT OF COLUMBIA POLICE OFFICER,
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AND MATTHEW
RIDER, DISTRICT OF COLUMBIA POLICE OFFICER,
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-01228)

*Joseph A. Scrofano* argued the cause and filed the briefs for appellant.

*Carl J. Schifferle*, Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. With him on the brief were *Karl A. Racine*, Attorney General, *Todd S. Kim*, Solicitor General, and *Loren L. AliKhan*, Deputy Solicitor General.

Before: KAVANAUGH, SRINIVASAN, and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

SRINIVASAN, *Circuit Judge*:  Jonathan Hedgpeth brought a civil suit against two police officers, alleging that they violated his Fourth Amendment rights by arresting him without probable cause and using excessive force to subdue him.  The officers moved for summary judgment, arguing that they were protected by qualified immunity from Hedgpeth's claims.  The district court granted summary judgment in favor of the officers, and we affirm.

I.

For purposes of reviewing the court's grant of summary judgment against Hedgpeth, we view the facts giving rise to his arrest in the light most favorable to him.  *Johnson v. District of Columbia*, 528 F.3d 969, 973 (D.C. Cir. 2008).  As we explain below, however, we resolve one factual dispute against Hedgpeth (concerning whether one of the officers intended to injure Hedgpeth) based on the absence of evidentiary support for Hedgpeth's account.  Hedgpeth does not himself recall the events surrounding his arrest, but introduced the testimony of Marcus Lee, a witness to the arrest.

On the evening of March 2, 2015, two officers of the Washington, D.C. Metropolitan Police Department, Ammar Rahim and Matthew Rider, were coordinating medical assistance for a homeless man when a disturbance down the street caught their attention.  The officers observed Hedgpeth push a tall, African-American man, who returned the push, as the pair walked towards the officers.  According to the officers, the man pushed by Hedgpeth approached them and said he did not know Hedgpeth and asked whether they had seen Hedgpeth push him.

Some time later, the officers approached Hedgpeth outside a bar. At the time, Hedgpeth was conversing with a former colleague, the aforementioned Marcus Lee. The officers explained that they had received reports of someone going up and down the street hitting others. Initially, Lee attempted to explain that he and Hedgpeth had greeted each other with a benign "buddy punch," but Lee quickly realized the officers were investigating something that had happened before his arrival. (Although there is a dispute between the parties on whether Lee was the tall, African-American man whom the officers had previously seen Hedgpeth push—Hedgpeth says yes, the officers say no—we have no need to resolve that dispute, as explained below.)

The officers began to question Hedgpeth, with little success. Officer Rider asked Hedgpeth for his name and inquired whether he had been drinking, but Hedgpeth did not respond. When Hedgpeth did speak, he slurred his words and avoided answering any questions. Officer Rider then asked Hedgpeth for identification, which he reluctantly surrendered. When Officer Rider attempted to photograph the identification card, Hedgpeth continued to speak incoherently and swore at the officers. At some point, the officers asked Lee if he would be willing to take Hedgpeth home. Lee responded that Hedgpeth was "hard to handle." J.A. 69-70.

After warning Hedgpeth several times to calm down, Officer Rahim told him he was under arrest. Hedgpeth began to scream, shouting that he had done nothing wrong and demanding to be let go. Officer Rahim ordered Hedgpeth to put his arms behind his back, but Hedgpeth did not comply. After Officer Rahim repeated his order multiple times, he reached for Hedgpeth's left arm. Officer Rahim also used his knee to push the back of Hedgpeth's leg and take him down to

the ground.  As Hedgpeth fell, his head struck the grid of the paned window of the bar.

With Hedgpeth on the ground, Officer Rider grabbed his arm and the officers handcuffed him.  As a result of his head hitting the window, Hedgpeth suffered a concussion, headaches, vertigo, and other post-concussive symptoms.  No criminal charges were brought against Hedgpeth.

Several months later, Hedgpeth sued the two officers in their individual capacities in the district court.  *See* 42 U.S.C. § 1983.  Hedgpeth alleged that his arrest was unlawful and that Officer Rahim had used excessive force against him, both in violation of the Fourth Amendment.  The officers moved for summary judgment, contending that they had acted lawfully and that, in any event, they were entitled to qualified immunity against Hedgpeth's suit.

The district court granted the officers' motion for summary judgment.  The court concluded that the officers had probable cause to arrest Hedgpeth for a number of offenses, including public intoxication.  The court also held that Officer Rahim was entitled to qualified immunity on the excessive-force claim because no clearly established law prohibited the takedown maneuver he allegedly used to effect the arrest.  Hedgpeth now appeals.

## II.

On appeal, Hedgpeth renews his contentions that the officers unlawfully arrested him without probable cause and that Officer Rahim used excessive force against him.  In order to prevail on his claims, Hedgpeth needs to surmount the officers' claim of qualified immunity.

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). The purpose of the doctrine is to protect officials "from undue interference with their duties and from potentially disabling threats of liability" in civil damages actions. *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). We review de novo the district court's grant of summary judgment on the basis of qualified immunity. *See Lash v. Lemke*, 786 F.3d 1, 5 (D.C. Cir. 2015).

To prevail against the officers' claim of qualified immunity, Hedgpeth must show that: (i) the officers violated his Fourth Amendment rights; and (ii) his Fourth Amendment rights were "clearly established . . . in light of the specific context of the case." *Scott v. Harris*, 550 U.S. 372, 377 (2007). We can take up those questions in either order. *E.g.*, *Mullenix*, 136 S. Ct. at 308. We thus have discretion to forgo assessing whether the officers infringed Hedgpeth's Fourth Amendment rights and to resolve the claims on the ground that, regardless of whether a Fourth Amendment violation occurred, the officers "did not violate clearly established law." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam). We follow that course here.

Although the Supreme Court's decisions do "not require a case directly on point for a right to be clearly established" for purposes of qualified immunity, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (internal quotation marks omitted). And the "clearly established law should not be defined at a high level of generality," but "must be particularized to the facts of the case." *Id.* at 552 (internal quotation marks omitted). The Court

has observed that immunity thus "protects all but the plainly incompetent or those who knowingly violate the law." *Id.* at 551 (internal quotation marks omitted).

A.

We first address Hedgpeth's claim that the officers violated his rights under the Fourth Amendment by arresting him without probable cause. To demonstrate that their warrantless arrest of Hedgpeth was lawful, the officers would need to show they had probable cause to arrest him. *See Wardlaw v. Pickett*, 1 F.3d 1297, 1304 (D.C. Cir. 1993). And regardless of whether they in fact had probable cause, they are entitled to qualified immunity if they "had an objectively reasonable basis for believing that the facts and circumstances surrounding the arrest were sufficient to establish probable cause." *Id.*; *see Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The officers argue that they had probable cause to arrest Hedgpeth for a number of offenses. They contend that they had probable cause to arrest Hedgpeth for public intoxication based on his belligerent behavior. They alternatively submit that they had probable cause to arrest him for disorderly conduct, simple assault, and affray, all based on their belief that he had pushed a stranger on the street. The district court accepted the officers' assertion that Hedgpeth had pushed a stranger, finding that the record foreclosed Hedgpeth's position that the person the officers saw him push in fact was Lee, not a third person. *Hedgpeth v. Rahim*, 213 F. Supp. 3d 211, 223 (D.D.C. 2016). Although Hedgpeth contests the district court's finding on that score, we need not resolve his objection. The officers had a reasonable basis for believing they had probable cause to arrest Hedgpeth for public intoxication, which alone entitles them to qualified immunity on the claim of an unlawful arrest.

Under D.C. law, it is a misdemeanor for a person to "be intoxicated and endanger the safety of himself, herself, or any other person or property." D.C. Code § 25-1001(c). For purposes of qualified immunity, then, Officers Rahim and Rider must have reasonably believed that Hedgpeth was both intoxicated and dangerous.

The record shows that the officers could have reasonably believed Hedgpeth to be intoxicated. When they attempted to question him, he appeared incapable of answering. Hedgpeth's key witness, Lee, testified that Hedgpeth acted drunk, slurring his words and speaking incoherently to the officers. Hedgpeth also was nonresponsive to the officers' questions and noncompliant with their orders. In those circumstances, a reasonable officer could have believed that Hedgpeth was intoxicated.

To prevail, the officers also must have had reasonable grounds to believe that Hedgpeth presented a danger to himself or others. Hedgpeth contends that he posed no danger to himself or anyone else because he did not stagger or fall. Rather, he argues, he was merely "verbally and passively belligerent." Appellant's Br. 32.

Even if Hedgpeth remained able to stand without staggering, the officers could have reasonably believed he presented a danger to himself, the officers, or someone else he might have encountered that night. Hedgpeth was visibly intoxicated and uncooperative, and there is no genuine dispute that the officers were at least under the impression that he had just been hitting people on a busy sidewalk. And Lee demurred at the officer's suggestion that he take Hedgpeth home, responding that Hedgpeth was "hard to handle." J.A. 70. As Hedgpeth's behavior began to attract a crowd, the officers had

reasonable grounds to conclude that Hedgpeth presented a risk to himself and others.

Although there is a dearth of decisions interpreting D.C.'s public intoxication law in relevant respects, decisions from other courts applying comparable public-intoxication laws in similar circumstances support the reasonableness of the officers' belief of probable cause. *See Garcia v. Killingsworth*, 425 F. App'x 831, 832 (11th Cir. 2011); *O'Dwyer v. Nelson*, 310 F. App'x 741, 746 (5th Cir. 2009); *State v. Trane*, 57 P.3d 1052, 1062 (Utah 2002). *See generally Johnson*, 528 F.3d at 976 (explaining that "cases from other courts exhibiting consensus view" can inform "whether officers strayed beyond clearly established bounds of lawfulness"). We therefore conclude that the officers could have reasonably believed Hedgpeth was intoxicated and posed a danger to himself or others. As a result, the officers are entitled to qualified immunity on Hedgpeth's claim of an unlawful arrest.

### B.

We now consider Hedgpeth's claim that Officer Rahim used excessive force when subduing Hedgpeth in connection with his arrest. Hedgpeth presents two variations of an argument that Officer Rahim used excessive force: first, Hedgpeth asserts that the takedown maneuver involved a gratuitous use of force intended to injure him; and second, he submits that, regardless of any intent to injure him, the use of a takedown maneuver was excessive in the circumstances.

Hedgpeth's first argument is grounded in a contention that Officer Rahim intended to slam Hedgpeth's head into the bar window when executing the takedown. That contention, however, finds no support in the record. With regard to Hedgpeth's claim that the takedown maneuver amounted to excessive force regardless of any intent to injure him, we

conclude that Officer Rahim's conduct did not violate clearly established law.  He is therefore entitled to qualified immunity.

1.

Hedgpeth contends that Officer Rahim, in performing a takedown maneuver, intended to slam Hedgpeth's head into the window of the bar.  Ordinarily, when reviewing the district court's grant of summary judgment, we would accept as true Hedgpeth's version of the facts.  *See Scott*, 550 U.S. at 378.  We do so, however, only if the record gives rise to a *genuine* issue of material fact.  We "should not adopt [a] version of the facts" that "is blatantly contradicted by the record, so that no reasonable jury could believe it."  *Id.* at 380.

Here, nothing in the record supports Hedgpeth's allegation that Officer Rahim intentionally slammed Hedgpeth's head into the window.  To the contrary, the sole evidence Hedgpeth cites in support of his account of the events is Lee's testimony, which affirmatively undercuts Hedgpeth's claim.  Lee testified that, while he saw Officer Rahim use a type of takedown maneuver, he did not believe the officer intended to slam Hedgpeth's head into the window.  Lee explained:  "I don't think [Officer Rahim] meant for Jonathan [Hedgpeth] to slam his head [into] the side of the building.  I think that's just what happened as [Hedgpeth] was falling to his left side."  Lee Deposition, J.A. 76.  The officers, for their part, deny that Officer Rahim performed a takedown maneuver, and contend that any impact to Hedgpeth's head was incidental to Hedgpeth's attempting to step away.

That leaves Hedgpeth's bare assertion (in his appellate brief) that Officer Rahim intended to slam Hedgpeth's head, which is not enough to create a genuine dispute about the officer's intentions, particularly in view of the contrary testimony of Hedgpeth's sole witness.  We therefore proceed

to consider whether Officer Rahim's takedown maneuver amounted to excessive force without attributing to him any intention to cause Hedgpeth's head to strike the window.

2.

The Fourth Amendment's prohibition on unreasonable seizures extends to an officer's use of excessive force to conduct an arrest. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014). As the Supreme Court has explained, "the question whether an officer has used excessive force 'requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). An officer may "use some degree of physical coercion" or threat to arrest a suspect. *Oberwetter v. Hilliard*, 639 F.3d 545, 555 (D.C. Cir. 2011) (quoting *Graham*, 490 U.S. at 396). And "[n]ot every push or shove, even if it may later seem unnecessary," violates the Fourth Amendment. *Id.* (internal quotation marks omitted).

Here, the district court considered the reasonableness of Officer Rahim's use of a forcible takedown maneuver under the assumed facts to be a close question, in light of, among other things, the misdemeanor nature of the suspected offenses. The court, though, did not decide that underlying Fourth Amendment question, instead concluding that Officer Rahim is entitled to qualified immunity. We agree.

Even if there is a genuine dispute about the reasonableness of an officer's use of force, he is protected by qualified immunity unless his force violated clearly established law. *See Kisela*, 138 S. Ct. at 1152; *Wardlaw*, 1 F.3d at 1303. As the

Supreme Court has recently emphasized, "[u]se of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela*, 138 S. Ct. at 1153 (quoting *Mullenix*, 136 S. Ct. at 309). In that regard, "[p]recedent involving similar facts can help move a case beyond the otherwise 'hazy border between excessive and acceptable force.'" *Id.* (quoting *Mullenix*, 136 S. Ct. at 312).

The pertinent question here is whether "any competent officer," in light of "[p]recedent involving similar facts," *id.*, would consider it unlawful to use a takedown maneuver against a suspect who was shouting repeatedly and belligerently at the officers, who refused their orders to put his hands behind his back, and who had been described by a person with him as "hard to handle." We conclude that this is not "an obvious case in which any competent officer would have known that" the use of a takedown maneuver in those circumstances "would violate the Fourth Amendment." *Id.*

In *Wardlaw v. Pickett*, for instance, Wardlaw rushed down the stairs in a courthouse stairwell towards officers and a friend who had been arrested by them, shouting to the officers: "Don't hurt him please. He is totally nonviolent." 1 F.3d at 1300. One of the officers punched Wardlaw once in the jaw and multiple times in the chest, and then arrested him. Wardlaw, contending that he experienced significant pain in his chest and jaw for months, brought suit alleging that the officer had used excessive force in arresting him. We granted the officer qualified immunity, noting that he was in a vulnerable position facing an individual shouting at him as the individual approached. *Id.* at 1304. We held that "no reasonable jury could find that [the officer's] use of force was

so excessive that no reasonable officer could have believed it to be lawful." *Id.*

In *Scott v. District of Columbia*, 101 F.3d 748 (D.C. Cir. 1996), a person who had been pulled over on suspicion that he was driving under the influence had acted belligerently and erratically at the scene. He attempted to exit a police car while it was at an intersection en route to the station, and an officer grabbed him in an effort to prevent his escape. Upon seeing other officers arrive, Scott offered to get back into the car. *Id.* at 752. Officers refused to let him back into the car, one officer struck him and knocked him off balance, and multiple officers then slammed him to the ground before handcuffing him and dragging him to a police transport vehicle. *Id.* at 759. We held that the "degree of forced used to arrest [the suspect] was not so excessive that no reasonable officer could have believed in the lawfulness of his actions." *Id.*

In *Oberwetter v. Hilliard*, a woman dancing at the Jefferson Memorial ignored officers' demands that she leave the premises and questioned their authority to force her to do so. 639 F.3d at 555-56. The arresting officer then forcefully pulled her arm behind her back and shoved her against a stone column, ripping apart the earbud on her headphones. *Id.* at 548. We held that it was "not clearly unreasonable for [the officer] to take decisive action to subdue [the suspect] quickly and forcefully." *Id.* at 555. In another case, we rejected an excessive-force claim against an officer who "brutally grabbed" a driver around the waist as he got out of the car while attempting to produce his license and registration, threw the driver back into his car, and then slammed the door on his leg. *Martin v. Malhoyt*, 830 F.2d 237, 240, 262 (D.C. Cir. 1987); *see Scott*, 101 F.3d at 760 (discussing *Martin*). *See also Rogala v. District of Columbia*, 161 F.3d 44, 45, 54-55 (D.C. Cir. 1998) (summarily affirming grant of qualified immunity to

officer who slammed person to the ground after person touched officer on shoulder).

Against the backdrop of those decisions, we are unable to conclude that Officer Rahim violated clearly established law in using a takedown maneuver to subdue Hedgpeth in the circumstances present here.  It is true that this case differs from our prior decisions in certain respects in that it does not involve a person rushing in the direction of officers, albeit while pleading for non-violence (compare *Wardlaw*), or a person who exited a police car, although he then offered to reenter it (compare *Scott*).  But this case is comparable to our prior decisions in that it involves a person who exhibited belligerent and erratic behavior (and had been described as hard to handle), who shouted at officers in an increasingly agitated fashion, and who repeatedly refused the officers' orders (here, to put his hands behind his back).  In that context, "existing precedent" cannot be said to "have placed the statutory or constitutional question beyond debate."  *Mullenix*, 136 S. Ct. at 308 (internal quotation marks omitted).

This does not mean an officer invariably has authority to forcibly take down a suspect in the course of a routine arrest.  But here, in light of the circumstances of this case and the applicable precedent, this case is not one in which "the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."  *Kisela*, 138 S. Ct. at 1153 (internal quotation marks omitted).  That conclusion is fortified by decisions from other courts sustaining an arresting officer's use of an analogous level of force against a noncomplying suspect.  *See Ehlers v. City of Rapid City*, 846 F.3d 1002, 1011 (8th Cir. 2017); *Griggs v. Brewer*, 841 F.3d 308, 316 (5th Cir. 2016).

In response, Hedgpeth relies on decisions barring the gratuitous use of physical force when conducting an arrest. For example, we have held that an officer acted unreasonably when he kicked a suspect in the groin while the suspect lay on the ground and posed no risk of flight. *Johnson*, 528 F.3d at 974-77. Similarly, we denied qualify immunity to an officer who punched, pistol-whipped, and beat a suspect who had already been disarmed and placed in handcuffs. *Arrington v. United States*, 473 F.3d 329, 331-33 (D.C. Cir. 2006).

There is no comparable use of gratuitous force in this case. As we have explained, the record contradicts Hedgpeth's theory that Officer Rahim intentionally (and gratuitously) slammed Hedgpeth's head into the bar window. Without that assertion, we are left with Officer Rahim's use of a takedown maneuver. The law in this court (and other courts) does not clearly establish that the takedown amounted to excessive force in the circumstances. We thus uphold the grant of qualified immunity on Hedgpeth's excessive-force claim.

\* \* \* \* \* \*

For the foregoing reasons, we affirm the district court's judgment.

*So ordered.*