# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 23, 2014       Decided August 28, 2015

No. 13-5250

HAROLD H. HODGE, JR.
APPELLEE

v.

PAMELA TALKIN, MARSHAL OF THE UNITED STATES SUPREME COURT, AND VINCENT H. COHEN, JR., ESQUIRE, IN HIS OFFICIAL CAPACITY AS ACTING UNITED STATES ATTORNEY, APPELLANTS

Appeal from the United States District Court
for the District of Columbia
(No. 1:12-cv-00104)

*Beth S. Brinkmann*, Attorney, U.S. Department of Justice, argued the cause for appellants.

On the briefs were *Stuart F. Delery*, Assistant Attorney General, *Ronald C. Machen*, *Jr.*, U.S. Attorney, and *Michael S. Raab* and *Daniel Tenny*, Attorneys. *Jane M. Lyons*, Assistant U.S. Attorney, entered an appearance.

*Jeffrey L. Light* argued the cause and filed the brief for appellee.

2

*Arthur B. Spitzer* was on the brief for *amicus curiae* American Civil Liberties Union of the National Capital Area in support of appellee.

Before: HENDERSON and SRINIVASAN, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

SRINIVASAN, *Circuit Judge*: For more than sixty-five years, a federal statute has restricted the public's conduct of expressive activity within the building and grounds of the Supreme Court. The law contains two prohibitions within the same sentence. The first makes it unlawful "to parade, stand, or move in processions or assemblages in the Supreme Court Building or grounds" (the Assemblages Clause). The second makes it unlawful "to display in the Building and grounds a flag, banner, or device designed or adapted to bring into public notice a party, organization, or movement" (the Display Clause). 40 U.S.C. § 6135. The statute defines the Supreme Court "grounds" to extend to the public sidewalks forming the perimeter of the city block that houses the Court.

In *United States v. Grace*, 461 U.S. 171 (1983), the Supreme Court held the statute's Display Clause unconstitutional as applied to the sidewalks at the edge of the grounds. The Court found "nothing to indicate to the public that these sidewalks are part of the Supreme Court grounds" or that they "are in any way different from other public sidewalks in the city." *Id.* at 183. Like other public sidewalks, consequently, the sidewalks surrounding the Court qualify as a "public forum" for First Amendment purposes, an area in which "the government's ability to permissibly restrict expressive conduct is very limited." *Id.* at 177, 179-80. But the Court left for another day the constitutionality of the

statute's application to the rest of the grounds, including the Court's plaza: the elevated marble terrace running from the front sidewalk to the staircase that ascends to the Court's main doors.

We confront that issue today. The plaintiff in this case, Harold Hodge, Jr., seeks to picket, leaflet, and make speeches in the Supreme Court plaza, with the aim of conveying to the Court and the public what he describes as "political messages" about the Court's decisions. Hodge claims that the statute's Assemblages and Display Clauses, by restricting his intended activities, violate his rights under the First Amendment. The district court, persuaded by his arguments, declared the statute unconstitutional in all its applications to the Court's plaza. We disagree and conclude that the Assemblages and Display Clauses may be constitutionally enforced in the plaza.

In marked contrast to the perimeter sidewalks considered in *Grace*, the Supreme Court plaza distinctively "indicate[s] to the public"—by its materials, design, and demarcation from the surrounding area—that it is very much a "part of the Supreme Court grounds." *Id.* at 183. The plaza has been described as the opening stage of "a carefully choreographed, climbing path that ultimately ends at the courtroom itself." *Statement Concerning the Supreme Court's Front Entrance*, 2009 J. Sup. Ct. U.S. 831, 831 (2010) (Breyer, J.). For that reason, the Court's plaza—unlike the surrounding public sidewalks, but like the courthouse it fronts—is a "nonpublic forum," an area not traditionally kept open for expressive activity by the public. The government retains substantially greater leeway to limit expressive conduct in such an area and to preserve the property for its intended purposes: here, as the actual and symbolic entryway to the nation's highest court and the judicial business conducted within it.

Under the lenient First Amendment standards applicable to nonpublic forums, the government can impose reasonable restrictions on speech as long as it refrains from suppressing particular viewpoints. Neither the Assemblages Clause nor the Display Clause targets specific viewpoints. They ban demonstrations applauding the Court's actions no less than demonstrations denouncing them. And both clauses reasonably relate to the government's long-recognized interests in preserving decorum in the area of a courthouse and in assuring the appearance (and actuality) of a judiciary uninfluenced by public opinion and pressure. The Supreme Court recently, in its just-completed Term, strongly reinforced the latter interest's vitality, along with the government's considerable latitude to secure its realization even through speech-restrictive measures. *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656 (2015). The statute's reasonableness is reinforced by the availability of an alternative site for expressive activity in the immediate vicinity: the sidewalk area directly in front of the Court's plaza. We therefore uphold the statute's constitutionality.

I.

A.

The federal statute in issue, 40 U.S.C. § 6135, makes it unlawful "to parade, stand, or move in processions or assemblages in the Supreme Court Building or grounds, or to display in the Building and grounds a flag, banner, or device designed or adapted to bring into public notice a party, organization, or movement." Congress enacted the statute in 1949. *See* Act of Aug. 18, 1949, ch. 49, 63 Stat. 616, 617 (1949) (current version at 40 U.S.C. § 6135) (originally codified at *id.* § 13k). Another provision defines "the Supreme Court grounds" to extend to the curbs of the four

streets fixing the boundary of the city block in which the Court is situated. 40 U.S.C. § 6101(b). The statute thus encompasses "not only the building," but also "the plaza and surrounding promenade, lawn area, and steps," together with "[t]he sidewalks comprising the outer boundaries of the Court grounds." *Grace*, 461 U.S. at 179.

The front of the Supreme Court grounds, from the street to the building, appears as follows (according to the record in this case and sources of which we take judicial notice, *see* Fed. R. Evid. 201(b); *Oberwetter v. Hilliard*, 639 F.3d 545, 552 n.4 (D.C. Cir. 2011)). The Court's main entrance faces west towards First Street Northeast, across which sits the United States Capitol. Eight marble steps, flanked on either side by marble candelabra, ascend from the concrete sidewalk along First Street Northeast to the Court's elevated marble plaza: an oval terrace that is 252 feet long (at the largest part of the oval) and 98 feet wide (inclusive of the front eight steps). Decl. of Timothy Dolan, Deputy Chief of the Supreme Court Police, ¶ 6 (Dolan Decl.) (J.A. 17-18). The terrace is "paved in gray and white marble" in "a pattern of alternating circles and squares similar to that of the floor of the Roman Pantheon." Fred J. Maroon & Suzy Maroon, *The Supreme Court of the United States* 36 (1996). The plaza contains two fountains, two flagpoles, and six marble benches. Another thirty-six steps lead from the plaza to the building's portico and "the magnificent bronze doors that are the main entrance into the building." *Id.* at 38. A low marble wall surrounds the plaza and also encircles the rest of the building. And the plaza's white marble matches the marble that makes up the low wall, the two staircases, the fountains, and the building's façade and columns. Pamela Scott & Antoinette J. Lee, *Buildings of the District of Columbia* 138 (1993).



*Supreme Court Building*, Architect of the Capitol,
http://www.aoc.gov/capitol-buildings/supreme-court-building
(last visited Aug. 20, 2015).

B.

Prior challenges to § 6135 and related provisions form
the legal backdrop for the case we consider today.  Section
6135's restrictions on expressive activity in the Supreme
Court grounds mirror a parallel statute restricting the same
activity in the grounds of the United States Capitol.  *See* 40
U.S.C. § 5104(f) (originally codified at *id.* § 193g).  The
statute applicable to the Capitol became the subject of a
constitutional challenge in *Jeannette Rankin Brigade v. Chief
of Capitol Police*, 342 F. Supp. 575 (D.D.C. 1972).  There, a
three-judge court declared the statute unconstitutional under
the First and Fifth Amendments, enjoining the Capitol Police
from enforcing it.  *Id.* at 587-88.  The court ruled that the
government's interest in maintaining decorum failed to justify
a ban on political demonstrations outside the building housing

the nation's elected representatives. *Id.* at 585. The Supreme Court summarily affirmed. *Chief of the Capitol Police v. Jeannette Rankin Brigade*, 409 U.S. 972 (1972).

A few years later, the statute applicable to the Supreme Court grounds also came under attack in the courts. The plaintiffs, Mary Grace and Thaddeus Zywicki, experienced run-ins with the Supreme Court Police when engaged in expressive activity on the public sidewalk fronting the Court along First Street. *Grace*, 461 U.S. at 173-74. Zywicki had distributed written material to passersby on multiple occasions, including articles calling for the removal of unfit judges and handbills discussing human rights in Central American countries. *Id.* Grace had stood on the sidewalk holding a sign displaying the text of the First Amendment. *Id.* at 174. The district court declined to reach the merits of Grace and Zywicki's suit, *Grace v. Burger*, 524 F. Supp. 815, 819-20 (D.D.C. 1980); but our court did, declaring the statute unconstitutional on its face in all of its applications to the Court grounds, *Grace v. Burger*, 665 F.2d 1193, 1205-06 (D.C. Cir. 1981). The Supreme Court affirmed our judgment in part and vacated it in part. *Grace*, 461 U.S. at 184. Given the decision's obvious salience to our consideration of this case, we review the Court's analysis in some detail.

Before addressing the merits, the Supreme Court significantly narrowed the case in two ways. First, the Court noted that the conduct giving rise to the challenge—solitary leafleting on Zywicki's part, and solitary sign-holding on Grace's—could violate only the statute's Display Clause, not the Assemblages Clause. *Id.* at 175. The Court thus understood the decision under review to be confined to the Display Clause. *Id.* at 175 & n.5. Second, the Court decided, based on the location of Grace's and Zywicki's past conduct, that their "controversy" only concerned the "right to use the

public sidewalks surrounding the Court building" to engage in expressive activity. *Id.* at 175. The Court therefore chose to resolve "only whether the proscriptions of [the statute] are constitutional as applied to the public sidewalks," without addressing the constitutionality of the statute's application to the remainder of the Court's statutorily defined grounds. *Id.*

The Court then set out to determine the character of the sidewalks in question for purposes of the "forum" taxonomy used to assess the constitutionality of speech restrictions on public property. Under that taxonomy, the Court explained, "'public places' historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be 'public forums.'" *Id.* at 177. "In such places, the government's ability to permissibly restrict expressive conduct is very limited," such that "an absolute prohibition on a particular type of expression will be upheld only if narrowly drawn to accomplish a compelling governmental interest." *Id.* On the other hand, in public property constituting a "nonpublic forum," the government enjoys significantly greater latitude to regulate expressive activity, including the ability "in some circumstances" to "ban the entry . . . of all persons except those who have legitimate business on the premises." *Id.* at 178.

Applying those principles to the "sidewalks comprising the outer boundaries of the Court grounds," the Court reasoned that they "are indistinguishable from any other sidewalks in Washington, D.C.," and there is "no reason why they should be treated any differently." *Id.* at 179. "Sidewalks, of course, are among those areas of public property that traditionally have been held open to the public for expressive activities and are clearly within those areas of public property that may be considered, generally without further inquiry, to be public forum property." *Id.* With

respect to the perimeter sidewalks specifically, the Court observed, there is "no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks . . . that they have entered some special type of enclave," and "nothing to indicate to the public that these sidewalks are part of the Supreme Court grounds." *Id.* at 180, 183. "Traditional public forum property" of that variety, the Court explained, "will not lose its historically recognized character for the reason that it abuts government property that has been dedicated to a use other than as a forum for public expression." *Id.* at 180. The Court therefore held that the "public sidewalks forming the perimeter of the Supreme Court grounds . . . are public forums and should be treated as such for First Amendment purposes." *Id.*

The Court next assessed the constitutionality of the Display Clause under the heightened standards applicable to public forums. It examined the necessity of the Display Clause's restrictions by reference to two asserted governmental interests: first, the interest in maintaining "proper order and decorum" in the Supreme Court building and grounds and in protecting "persons and property therein"; and second, the interest in avoiding the "*appear[ance]* to the public that the Supreme Court is subject to outside influence or that picketing or marching, singly or in groups, is an acceptable or proper way of appealing to or influencing the Supreme Court." *Id.* at 182-83. The Court did not doubt the importance and legitimacy of those interests. *Id.* But it found a "total ban" on leafleting and sign-holding on the surrounding public sidewalks unnecessary to promote them. *Id.* For instance, without any indication "to the public" that the "sidewalks are part of the Supreme Court grounds or are in any way different from other public sidewalks," the Court "doubt[ed] that the public would draw a different inference from a lone picketer carrying a sign on the sidewalks around

the building than it would from a similar picket on the sidewalks across the street." *Id.* at 183. The Court therefore declared the Display Clause unconstitutional as applied to the public sidewalks surrounding the Court, but it vacated our court's invalidation of the statute with regard to the remainder of the grounds. *Id.* at 183-84.

C.

Although *Grace* concerned the Display Clause alone, the Supreme Court Police ceased enforcement of both the Display and Assemblages Clauses on the perimeter sidewalks. Dolan Decl. ¶ 5 (J.A. 17). The Police have continued to enforce both clauses elsewhere in the Supreme Court building and grounds, including in the Court's plaza. This case arises from the enforcement of the statute in the plaza.

On January 28, 2011, Harold Hodge, Jr., stood in the plaza approximately 100 feet from the building's front doors. Am. Compl. ¶¶ 17, 20 (J.A. 10). He hung from his neck a two-by-three-foot sign displaying the words "The U.S. Gov. Allows Police To Illegally Murder And Brutalize African Americans And Hispanic People." *Id.* ¶ 18 (J.A. 10). After a few minutes, a Supreme Court Police officer approached Hodge and told him he was violating the law. Hodge declined to leave. After three more warnings, the officer arrested him. On February 4, 2011, Hodge was charged with violating 40 U.S.C. § 6135. He entered into an agreement with the government under which he promised to stay away from the Supreme Court grounds for six months in exchange for dismissal of the charge, which occurred in September 2011.

In January 2012, Hodge filed the present action in federal district court. His complaint alleges that he "desires to return to the plaza area . . . and engage in peaceful, non-disruptive political speech and expression in a similar manner to his

activity on January 28, 2011." *Id.* ¶ 28 (J.A. 12). In addition to again wearing a sign, Hodge wishes to "picket, hand out leaflets, sing, chant, and make speeches, either by himself or with a group of like-minded individuals." *Id.* ¶ 29 (J.A. 12). Hodge says that the "political message that [he] would like to convey would be directed both at the Supreme Court and the general public, and would explain how decisions of the Supreme Court have allowed police misconduct and discrimination against racial minorities to continue." *Id.* And he states that he desires to engage in those activities "immediately" but is "deterred and chilled" from doing so by "the terms of 40 U.S.C. § 6135" and by his prior arrest and charge. *Id.* ¶ 30 (J.A. 12).

Hodge's complaint asserts a series of constitutional challenges under the First and Fifth Amendments. First, he claims that the Assemblages and Display Clauses amount to unconstitutional restrictions of speech. Second, he claims that both clauses are overbroad. Finally, he claims that both clauses are unconstitutionally vague. (The complaint also raises claims alleging that the Supreme Court Police selectively enforce the law in a manner favoring certain viewpoints, but the district court did not pass on those claims and Hodge does not press them in this appeal.) As relief, Hodge seeks a declaration of § 6135's invalidity "on its face, and as applied to [Hodge]," and a permanent injunction barring the government defendants (the Marshal of the Supreme Court and the United States Attorney for the District of Columbia) from enforcing the statute against Hodge or others. *Id.* p. 10 (J.A. 15).

The district court, finding the statute "plainly unconstitutional on its face," granted summary judgment in favor of Hodge. *Hodge v. Talkin*, 949 F. Supp. 2d 152, 176 & n.24 (D.D.C. 2013). In a thorough opinion, the court

invalidated the statute under the First Amendment based on two grounds.  The court first held that, regardless of whether the Supreme Court plaza is considered a public forum or a nonpublic forum, the statute amounts to an unreasonable restriction of speech as concerns the plaza.  *Id.* at 182-85.  Second, the court found the statute unconstitutionally overbroad in light of the potential sweep of its prohibitions.  In that regard, the court examined a range of hypothetical applications of the Assemblages and Display Clauses in the plaza which it found to be troubling.  *Id.* at 187-89.  The court's result was to declare § 6135 "unconstitutional and void as applied to the Supreme Court plaza." *Id.* at 198.  The court declined to reach Hodge's alternative challenges, including his vagueness claim.  *Id.* at 176 n.24.

The government appeals the district court's grant of summary judgment.  We review that court's legal determinations de novo.  *Lederman v. United States*, 291 F.3d 36, 41 (D.C. Cir. 2002).

II.

Before addressing the merits of Hodge's constitutional challenges, we initially assure ourselves of his standing for purposes of satisfying Article III's case-or-controversy requirement.  The question is whether he demonstrates an "injury in fact" that is "fairly . . . trace[able]" to the statute's challenged provisions.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

There is no dispute about Hodge's standing to challenge the Display Clause.  He has been arrested and charged for displaying a political sign while standing in the plaza, and he would do so again "immediately" if not for his fear of another arrest.  Am. Compl. ¶¶ 28-30 (J.A. 12).  The government does not contest those facts.  Given the Supreme Court Police's

policy of enforcing § 6135 in the plaza, *see* Dolan Decl. ¶ 7 (J.A. 18), there is a "substantial risk" of another arrest and charge if Hodge were to act on his stated intentions. That suffices to demonstrate a cognizable injury vis-à-vis the Display Clause. *See Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014).

Hodge's solitary display of a sign, however, did not violate the statute's Assemblages Clause—the prohibition on "parad[ing], stand[ing], or mov[ing] in processions or assemblages." 40 U.S.C. § 6135. The government maintains that the complaint's allegations fail sufficiently to establish Hodge's desire to engage in future conduct that would bring him within that prohibition's scope. The sole allegation bearing on his standing to challenge the Assemblages Clause conveys his desire "to return to the plaza area . . . and picket, hand out leaflets, sing, chant, and make speeches, *either by himself or with a group of like-minded individuals*." Am. Compl. ¶ 29 (J.A. 12) (emphasis added). The allegation's "either/or" phrasing, the government submits, renders Hodge's future intent to violate the Assemblages Clause unduly speculative: Hodge might return with a group of people, but then again, he might go it alone.

Hodge's articulation of his intentions suffices to establish his standing under our precedents. In *Lederman v. United States*, we considered a plaintiff's standing to bring a First Amendment challenge to a regulation banning a laundry list of "demonstration activit[ies]" (including "parading, picketing, leafleting, holding vigils, sit-ins, or other expressive conduct or speechmaking") in designated "no-demonstration zones" within the Capitol grounds. 291 F.3d at 39. The plaintiff had been arrested and charged after leafleting on the Capitol's East Front sidewalk. *Id.* at 39-40. In his complaint asserting a facial challenge to the entire

regulation, the plaintiff alleged that he "wishe[d] to come to Washington in the future . . . to engage in constitutionally-protected demonstration activity in the no-demonstration zone—including, but not necessarily limited to, leafleting and holding signs." *Id.* at 40.

Based on the plaintiff's arrest for leafleting and "his intent to return to the Capitol Grounds to engage in other expressive activity," we found that he had standing to challenge the entire regulation. *Id.* at 41. If the *Lederman* plaintiff's stated desire to engage in prohibited activity "including, but not necessarily limited to" leafleting and holding signs adequately established his intention to violate other parts of the regulation, Hodge's plans to return to the plaza "either by himself or with a group of like-minded individuals" suffices as well.

We therefore proceed to address the merits of Hodge's challenges to both the Display and Assemblages Clauses.

III.

Hodge attacks 40 U.S.C. § 6135 as unconstitutional "on its face and as applied to his desired activities." Am. Compl. ¶ 1 (J.A. 6). In granting summary judgment, the district court examined what it conceived to be two separate First Amendment arguments. First, the court found § 6135 facially unconstitutional as an unreasonable restriction of expressive activity on public property. Second, the court determined that § 6135 is overbroad. With respect to both conclusions, however, the court confined its analysis to the Supreme Court plaza. *See Hodge*, 949 F. Supp. 2d at 198.

We address below whether Hodge's overbreadth claim affords a separate basis for relief independent of his claim that § 6135 is an unreasonable restriction of speech. *See* Part IV,

*infra*. Regarding the restriction-of-speech claim, though, one might ask at the outset whether it is best considered a "facial" or an "as-applied" challenge. We briefly note the question because the distinction sometimes affects the applicable standards.

The Supreme Court often cautions that a facial challenge can succeed only if "'no set of circumstances exists under which the [statute] would be valid,' *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Yet the Court has also indicated that the standard for facial invalidity may be less stringent in some situations, instead turning on whether the statute lacks any "plainly legitimate sweep." *See id.* (citing *Washington v. Glucksberg*, 521 U.S. 702, 739-40 & n.7 (1997) (Stevens, J., concurring in judgments)); *United States v. Stevens*, 559 U.S. 460, 472 (2010). An ordinary as-applied challenge, by contrast, asks a court to assess a statute's constitutionality with respect to the particular set of facts before it. *See, e.g.*, *FEC v. Wisc. Right to Life, Inc.*, 551 U.S. 449, 456-57 (2007).

Hodge's challenge eludes ready classification. In examining Hodge's claim that the statute impermissibly restricts speech, we will naturally hypothesize applications of the law beyond his own particular conduct. On the other hand, notwithstanding Hodge's entreaties to invalidate the statute on its "face," he raises no meaningful challenge to the statute's application anywhere other than the plaza (within the Supreme Court building, for instance). Hodge's claim thus might be conceived of as "as-applied" in the sense that he confines his challenge to the statute's application to a particular site, but "facial" in the sense that he asks us to examine circumstances beyond his individual case.

There is no need for us to definitively resolve those questions of characterization. The "distinction between facial and as-applied challenges is not so well defined that it has some automatic effect." *Citizens United v. FEC*, 558 U.S. 310, 331 (2010). For our purposes, it suffices to say that we adhere to the Supreme Court's approach in *Grace*: we will examine the validity of the statute's application to a particular portion of the Supreme Court grounds—the plaza—looking beyond the plaintiff's particular conduct when assessing the statute's fit. *See United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 487 (1995) (O'Connor, J., concurring in judgment in part and dissenting in part) (describing *Grace* as a case in which the Court "declared a statute invalid as to a particular application without striking the entire provision that appears to encompass it," though noting that the Court's "jurisprudence in this area is hardly a model of clarity").

Having noted the "facial/as-applied" doctrinal undercard, we can now move on to the main event. In asking us to declare § 6135 unconstitutional in all its applications in the Supreme Court plaza, Hodge's claim implicates "the gravest and most delicate duty that [courts are] called on to perform": invalidation of an Act of Congress. *Blodgett v. Holden*, 275 U.S. 142, 147-48 (1927) (Holmes, J., concurring). We are not compelled to do so here. We reach that conclusion by examining Hodge's challenge in accordance with the Supreme Court's analysis in *Grace*. First, we assess whether the Supreme Court plaza is a public forum or a nonpublic forum, determining that the plaza is the latter. Next, we apply the First Amendment rules applicable in nonpublic forums. Under those relaxed standards, we conclude that the statute reasonably (and hence permissibly) furthers the government's interests in maintaining decorum and order in the entryway to the nation's highest court and in preserving the appearance

and actuality of a judiciary unswayed by public opinion and pressure.

A.

Hodge's desired activities in the Supreme Court plaza—picketing, leafleting, and speechmaking—lie at the core of the First Amendment's protections. Still, he does not have an automatic entitlement to engage in that conduct wherever (and whenever) he would like. Rather, the "Government, 'no less than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully dedicated.'" *Grace*, 461 U.S. at 178 (quoting *Adderley v. Florida*, 385 U.S. 39, 47 (1966)). That principle finds voice in the Supreme Court's "forum analysis," which "determine[s] when a governmental entity, in regulating property in its charge, may place limitations on speech." *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 679 (2010).

Some public property, as a matter of tradition, is deemed dedicated to the exercise of expressive activity by the public. The "quintessential" examples of such traditional public forums are streets, sidewalks, and parks, all of which, "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939) (opinion of Roberts, J.)). A public forum can also arise by specific designation (rather than tradition) when "government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009). The government "must respect the open character" of a public forum. *Oberwetter*,

639 F.3d at 551. "In such places," accordingly, "the government's ability to permissibly restrict expressive conduct is very limited." *Grace*, 461 U.S. at 177.

A nonpublic forum, by contrast, is public property that is "not by tradition or designation a forum for public communication." *Perry*, 460 U.S. at 46. "Limitations on expressive activity conducted on this . . . category of property must survive only a much more limited review." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679 (1992). In a nonpublic forum, a "challenged regulation need only be reasonable, as long as the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's view." *Id.*; *see Perry*, 460 U.S. at 46.

We find the Supreme Court plaza to be a nonpublic forum. The Court's analysis in *Grace* directly points the way to that conclusion. In finding that the sidewalks marking the perimeter of the Court's grounds are a public forum, the Court emphasized that there is "no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks" that "they have entered some special type of enclave." 461 U.S. at 180. Although certain sidewalks might constitute nonpublic forums if they serve specific purposes for particular public sites (such as providing solely for internal passage within those sites, *see United States v. Kokinda*, 497 U.S. 720, 727-30 (1990) (plurality opinion); *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 685 F.3d 1066, 1071 (D.C. Cir. 2012)), the *Grace* Court viewed the Supreme Court's perimeter sidewalks to be "indistinguishable from any other sidewalks in Washington, D.C.," 461 U.S. at 179. The Court therefore saw "nothing to indicate to the public that these sidewalks are part of the Supreme Court grounds" in particular. *Id.* at 183. As a result, there is "no reason why they should be treated any differently" from the

mine-run of public sidewalks, which are "considered, generally without further inquiry, to be public forum property." *Id.* at 179.

*Grace*'s analysis makes evident that the Supreme Court plaza, in contrast to the perimeter sidewalks, is a nonpublic forum. The Court considered it of pivotal significance that there was "nothing to indicate to the public that these sidewalks are part of the Supreme Court grounds," *id.* at 183, or that "they have entered some special type of enclave," *id.* at 180. The opposite is very much true of the Court's plaza.

The plaza's appearance and design vividly manifest its architectural integration with the Supreme Court building, as well as its separation from the perimeter sidewalks and surrounding area. The plaza is elevated from the sidewalk by a set of marble steps. A low, patterned marble wall—the same type of wall that encircles the rest of the building—surrounds the plaza platform and defines its boundaries. And the plaza and the steps rising to it are composed of white marble that contrasts sharply with the concrete sidewalk in front of it, but that matches the staircase ascending to the Court's front doors and the façade of the building itself. As one account explains, perhaps with a degree of romanticism, the "unusually high mica content" of the marble produces "[r]eflections . . . so brilliant on sunny days that they almost blind the viewer." Scott & Lee, *supra*, at 138.

From the perspective of a Court visitor (and also the public), the "physical and symbolic pathway to [the Supreme Court] chamber begins on the plaza." *Id.* Cass Gilbert, the Supreme Court's architect, conceived of the plaza, staircase, and portico leading to the massive bronze entry doors as an integrated "processional route" culminating in the courtroom. *Id.* Commenting on that design, a sitting Justice has written

that, "[s]tarting at the Court's western plaza, Gilbert's plan leads visitors along a carefully choreographed, climbing path that ultimately ends at the courtroom itself." *Statement Concerning the Supreme Court's Front Entrance*, 2009 J. Sup. Ct. U.S. at 831 (Breyer, J.).

In short, whereas there was "nothing to indicate to the public that [the] sidewalks are part of the Supreme Court grounds," *Grace*, 461 U.S. 183, there is everything to indicate to the public that the plaza is an integral part of those grounds. The plaza's features convey in many distinctive ways that a person has "entered some special type of enclave." *Id.* at 180. And in serving as what amounts to the elevated front porch of the Supreme Court building (complete with a surrounding railing), the plaza—like the building from which it extends, and to which it leads—is a nonpublic forum.

The Court in *Grace*, in fact, appeared to foreshadow precisely that result. Referring to the Court's perimeter sidewalks, *Grace* explained that "[t]raditional public forum property" of that kind does "not lose its historically recognized character for the reason that it abuts government property that has been dedicated to a use other than as a forum for public expression." *Id.* at 180. When it described the perimeter sidewalks as "abut[ting] government property that has been dedicated to a use other than as a forum for public expression," the Court presumably had in mind the plaza. The plaza, after all, "abuts" the perimeter sidewalk marking the front edge of the Supreme Court grounds along First Street Northeast. The Court thus seemed expressly to assume that its plaza is a nonpublic forum—*i.e.*, property "dedicated to a use other than as a forum for public expression."

That conclusion is consistent with the treatment of courthouses more generally. The area surrounding a

courthouse traditionally has not been considered a forum for demonstrations and protests. In *Cox v. Louisiana*, 379 U.S. 559 (1965), the Supreme Court rejected a First Amendment challenge to a Louisiana law prohibiting picketing or parades "in or near" courthouses if aimed to impede the administration of justice or influence a court officer. *Id.* at 560. The Court found there to be "no question that a State has a legitimate interest in protecting its judicial system from the pressures which picketing near a courthouse might create." *Id.* at 562.

Citing *Cox*, the three-judge court in *Jeannette Rankin Brigade* (which is "binding precedent" in light of the Supreme Court's summary affirmance, *Lederman*, 291 F.3d at 41) observed that the "area surrounding a courthouse" may "be put off limits to parades and other political demonstrations." 342 F. Supp. at 583. Whereas the "fundamental function of a legislature in a democratic society assumes accessibility to [public] opinion," the "judiciary does not decide cases by reference to popular opinion." *Id.* at 584. As a result, while the grounds of the United States Capitol are considered a public forum, *see id.*; *Lederman*, 291 F.3d at 41-42, the grounds of a courthouse are not.

Going beyond the realm of courthouses, moreover, the Supreme Court plaza bears a family resemblance to another plaza held not to be a public forum for expression by the general public:  the plaza located in the Lincoln Center performing arts complex in Manhattan. *See Hotel Emps. & Rest. Emps. Union, Local 100 v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 547-53 (2d Cir. 2002).  That plaza is a large, paved "outdoor square that serves as the centerpiece of the Lincoln Center complex." *Id.* at 540.  Like the relationship of the Supreme Court plaza to the Court building, the Lincoln Center plaza's "main purpose" is "to

serve as the 'forecourt' for the performing arts hall." *Id.* at 547. Although the plaza's "design clearly invites passers-by to stroll through or linger," the Second Circuit reasoned, "plazas that serve as forecourts in performing arts complexes are not the types of public spaces that have traditionally been dedicated to expressive uses." *Id.* at 551-52.

The court thus considered it "self-evident that permitting speech on all manner of public issues in the Plaza would compromise the City's ability to establish a specialized space devoted to contemplation and celebration of the arts." *Id.* at 552. So too, here: opening the Supreme Court plaza to "speech on all manner of public issues," *id.*, would compromise the plaza's function as an integrated forecourt for "contemplation of the Court's central purpose, the administration of justice to all who seek it." *Statement Concerning the Supreme Court's Front Entrance*, 2009 J. Sup. Ct. U.S. at 831.

Importantly, the Supreme Court plaza's status as a nonpublic forum is unaffected by the public's unrestricted access to the plaza at virtually any time. Indeed, in *Grace* itself, the Court emphasized that "property is not transformed into 'public forum' property merely because the public is permitted to freely enter and leave the grounds at practically all times." 461 U.S. at 178; *see Greer v. Spock*, 424 U.S. 828, 836 (1976). The Second Circuit therefore concluded that the Lincoln Center plaza is not a traditional public forum despite the fact that "public access to the Plaza is unrestricted" and non-patron pedestrians frequently "cross the Plaza en route to other destinations in the neighborhood." *Hotel Emps.*, 311 F.3d at 540. The court reasoned that, notwithstanding the ease and frequency of public access, visitors understand the plaza's function in terms of the property to which it

corresponds and accordingly sense that they are not in "a typical . . . town square." *Id.* at 550.

The same is true of open-air monuments held by this court to be nonpublic forums. *See Oberwetter*, 639 F.3d at 553. As our court observed in reference to the interior of the Jefferson Memorial, "[t]hat the Memorial is open to the public does not alter its status as a nonpublic forum. Visitors are not invited for expressive purposes, but are free to enter only if they abide by the rules that preserve the Memorial's solemn atmosphere." *Id.* Although those visitors may "regularly talk loudly, make noise, and take and pose for photographs, . . . none of this conduct rises to the level of a conspicuous demonstration." *Id.* at 552 (internal quotation marks and brackets omitted). Much the same could be said of the Supreme Court plaza.

While a nonpublic forum thus is not "transformed into 'public forum' property" by virtue of the government's permitting access for non-expressive purposes, *Grace*, 461 U.S. at 178, the near converse is also true: a *traditional public* forum is not transformed into *nonpublic* forum property by the expedient of the government's *restricting* access for *expressive* purposes. *See, e.g.*, *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 133 (1981); *Lederman*, 291 F.3d at 43. The Supreme Court has been clear that the government "may not by its own *ipse dixit* destroy the 'public forum' status of streets and parks which have historically been public forums." *Greenburgh Civic Ass'ns*, 453 U.S. at 133. In *Grace*, accordingly, the statute's restriction on expressive activity in an area defined to include the perimeter sidewalks did not itself transform the sidewalks into a nonpublic forum. The Court explained that governmental attempts to "destr[oy]" public-forum status via

such restrictions are "presumptively impermissible." 461 U.S. at 179-80.

While Hodge seeks to invoke that "*ipse dixit*" principle here, his effort is misdirected. The principle has no applicability with respect to the Supreme Court plaza because there is no background assumption—grounded in tradition—that the property is a public forum. The plaza plainly is not a street or sidewalk. Nor is it a park.

With regard to any suggestion that the Court's plaza could be considered some kind of park, the Second Circuit held that the Lincoln Center plaza is not a park for purposes of rendering it a traditional public forum even though the City's regulations define it as a "park" for purposes of establishing the Parks Department's authority over it. *Hotel Emps.*, 311 F.3d at 548-49 & n.10. We reached essentially the same conclusion concerning the Jefferson Memorial, which "is located within the National Park system." *Oberwetter*, 639 F.3d at 552. "[O]ur country's many national parks are too vast and variegated to be painted with a single brush for purposes of forum analysis," we recognized, and many areas within national parks "never have been dedicated to free expression and public assembly." *Id.* (quoting *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 515 (D.C. Cir. 2010)). Here, Hodge makes no argument that the Supreme Court plaza is defined as a "park" for any reason under the law. And regardless, the plaza, like courthouse grounds in general, has never been dedicated to the public's conduct of assemblages, expressive activity, and recreation in the manner of a traditional park.

None of this is to say that Congress could not *choose* to dedicate the Supreme Court plaza as a forum for the robust exercise of First Amendment activity by the general public.

The plaza could be transformed into a setting for demonstrations and the like. And if Congress were to open up the plaza as a public forum, the space would become subject to the same First Amendment rules that govern across the street on the grounds of the Capitol. *See Summum*, 555 U.S. at 469-70.

But whereas the Capitol grounds are a public forum by requirement of the First Amendment, *see Lederman*, 291 F.3d at 41-42, the Supreme Court plaza would become a public forum by choice of Congress. The difference exists because "[j]udges are not politicians." *Williams-Yulee*, 135 S. Ct. at 1662. And although "[p]oliticians are expected to be appropriately responsive to the preferences" of the public, *id.* at 1667—and therefore are expected to accommodate public expression on the grounds of the legislative chamber, *see Jeannette Rankin*, 342 F. Supp. at 584-85—the "same is not true of judges," *Williams-Yulee*, 135 S. Ct. at 1667. So while Congress *could* elect to dedicate the Court's plaza as a public forum, Congress has not done so. To the contrary, Congress has restricted expressive activity in the plaza through statutes like § 6135.

Nor have the Supreme Court's own enforcement practices transformed the plaza into a nonpublic forum. The Court's allowance of two forms of highly circumscribed expressive activity in the plaza—attorneys and litigants addressing the media immediately after a Supreme Court argument, and the occasional granting of approval to conduct filming on the plaza for commercial or professional films relating to the Court, Dolan Decl. ¶ 9 (J.A. 18)—is immaterial. The "government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius v. NAACP Legal Def. & Educ. Fund*,

473 U.S. 788, 802 (1985); *see Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679 (1998); *Greer*, 424 U.S. at 438 n.10.

For the same reason, it is of no moment that the Supreme Court Police in certain situations might opt to allow demonstrators onto the plaza for a brief period, presumably in an effort to exercise enforcement authority with responsible (and viewpoint-neutral) discretion in unique circumstances. For instance, notwithstanding the Court Police's usual practice of strict enforcement, *see* Dolan Decl. ¶¶ 5, 7, 9 (J.A. 17, 18), the Police apparently did not attempt to prevent a crowd of about 200 demonstrators from briefly "surg[ing] up the off-limits steps of the U.S. Supreme Court" late one night last fall "as part of nationwide protests against a Missouri grand jury's decision not to indict the police officer who fatally shot a Ferguson teenager." Tony Mauro, *Ferguson Protesters Swarm Steps of Supreme Court*, Legal Times, Nov. 25, 2014 (archived on LexisNexis). The protesters evidently moved on after about fifteen minutes, and the Police made no arrests. *Id.* The fact that the protesters made their way onto the plaza for a quarter of an hour did not somehow transform the plaza into a public forum for all time. Rather, the plaza was then, and remains now, a nonpublic forum.

### B.

Having concluded that the Supreme Court plaza is a nonpublic forum, we now examine whether the Assemblages and Display Clauses "survive . . . [the] much more limited review" governing speech restrictions in such areas. *Lee*, 505 U.S. at 679. Under that review, the restrictions "need only be reasonable, as long as [they are] not an effort to suppress the speaker's activity due to disagreement with the speaker's view." *Id.*

There is no suggestion that either clause discriminates on the basis of viewpoint. The Assemblages Clause makes it unlawful "to parade, stand, or move in processions or assemblages," and the Display Clause makes it unlawful to "display" a "flag, banner, or device designed or adapted to bring into public notice a party, organization, or movement." 40 U.S.C. § 6135. Whatever the scope of expressive activities within the reach of those prohibitions (a matter we explore in greater depth below), they operate without regard to the communication's viewpoint. Demonstrations supporting the Court's decisions and demonstrations opposing them are equally forbidden in the plaza.

The question, then, is whether the restrictions are reasonable in light of the government's interest in preserving the property for its intended purposes. *See Perry*, 460 U.S. at 46. We find that they are.

1.

The government puts forward two primary interests in support of § 6135's application in the Supreme Court plaza. First, the government argues that the statute helps maintain the decorum and order befitting courthouses generally and the nation's highest court in particular. Second, the government contends that the statute promotes the appearance and actuality of a Court whose deliberations are immune to public opinion and invulnerable to public pressure. Precedent lies with the government as to both interests.

With respect to the first, in *Grace*, the government relied on the statute's purpose "to provide for the . . . maintenance of proper order and decorum" in the Supreme Court grounds. 461 U.S. at 182. The Supreme Court concluded that the Display Clause bore "an insufficient nexus" to that interest under the strict standards applicable in a traditional public

forum. *Id.* at 181. But for present purposes, what matters is that the Court did "not denigrate the necessity . . . to maintain proper order and decorum within the Supreme Court grounds." *Id.* at 182. Reinforcing the point, the Court later reiterated that it did "not discount the importance of this proffered purpose for" the statute. *Id.* at 183. The Court's opinion therefore has been cited for the proposition that "it is proper to weigh the need to maintain the dignity and purpose of a public building." *Kokinda*, 497 U.S. at 738 (Kennedy, J., concurring in judgment).

That need fully applies to the Supreme Court plaza. As the actual and figurative entryway to the Supreme Court building and ultimately the courtroom, the plaza is one of the integrated architectural "elements [that] does its part to encourage contemplation of the Court's central purpose, the administration of justice to all who seek it." *Statement Concerning the Supreme Court's Front Entrance*, 2009 J. Sup. Ct. U.S. at 831. And as the public's staging ground to enter the Supreme Court building and engage with the business conducted within it, the plaza, together with the building to which it is integrally connected, is an area in which the government may legitimately attempt to maintain suitable decorum for a courthouse.

The government's concern with preserving appropriate decorum and order in the Court's plaza is not altogether unlike its interest in "promoting a tranquil environment" at the site of an open-air national monument or memorial, where visitors might "talk loudly, make noise, and take and pose for photographs," but cannot engage in "conduct ris[ing] to the level of a conspicuous demonstration." *Oberwetter*, 639 F.3d at 552 (internal quotation marks and brackets omitted). We have described the interest in maintaining a tranquil environment in such places to be "substantial." *Id.* at 554; *see*

*Henderson v. Lujan*, 964 F.2d 1179, 1184 (D.C. Cir. 1992). And that interest, as with the interest in maintaining suitable decorum in the area of a courthouse, is "no less significant for being subtle, intangible and nonquantifiable." *Henderson*, 964 F.2d at 1184.

The second interest the government invokes here was also recognized in *Grace*. There, the Court described the interest in preserving the appearance of a judiciary immune to public pressure as follows:

> Court decisions are made on the record before them and in accordance with the applicable law. The views of the parties and of others are to be presented by briefs and oral argument. Courts are not subject to lobbying, judges do not entertain visitors in their chambers for the purpose of urging that cases be resolved one way or another, and they do not and should not respond to parades, picketing or pressure groups.

*Grace*, 461 U.S. at 183. Because the Court viewed the perimeter sidewalks to be no "different from other public sidewalks in the city," it "doubt[ed] that the public would draw a different inference from" picketing on the perimeter sidewalks than from picketing "on the sidewalks across the street." *Id.* But the Court did "not discount the importance" of the interest in averting an "*appear[ance]* to the public that the Supreme Court is subject to outside influence or that picketing or marching, singly or in groups, is an acceptable or proper way of appealing to or influencing the Supreme Court." *Id.*

The Supreme Court has credited the same interest both before and after *Grace*. When it upheld a ban on courthouse-

area demonstrations aimed to influence the judicial process in *Cox v. Louisiana*, the Court recognized the state's prerogative to "adopt safeguards necessary and appropriate to assure that the administration of justice at all stages is free from outside control and influence." 379 U.S. at 562. And, while allowing that "most judges will be influenced only by what they see and hear in court," the Court affirmed that a state "may also properly protect the judicial process from being misjudged in the minds of the public." *Id.* at 565. The *Cox* Court hypothesized a scenario in which "demonstrators paraded and picketed for weeks with signs asking that indictments be dismissed," and then "a judge, completely uninfluenced by these demonstrations, dismissed the indictments." *Id.* "[U]nder these circumstances," the Court explained, a state "may protect against the possibility of a conclusion by the public . . . that the judge's action was in part a product of intimidation and did not flow only from the fair and orderly working of the judicial process." *Id.*

The decision in *Cox* came down fifty years ago. Since then, it may have become fashionable in certain quarters to assume that any reference to an apolitical judiciary "free from outside control and influence," *id.* at 562, should be met with a roll of one's eyes, or perhaps to view any suggestion to that effect as antiquated or quaintly idealistic. If so, the government's interest in preserving (or restoring) the public's impression of a judiciary immune to outside pressure would have only gained in salience. In fact, in its just-completed Term, the Supreme Court forcefully reaffirmed the vitality of the interest in preserving public confidence in the integrity of the judicial process.

In *Williams-Yulee v. Florida Bar*, the Court considered a First Amendment challenge to a Florida ban on judicial candidates' personal solicitation of campaign contributions.

Calling "public perception of judicial integrity" a governmental interest of "the highest order," 135 S. Ct. at 1666, the Court upheld the Florida ban as narrowly tailored to meet that compelling interest, *id.* at 1672. The Court explained that "[t]he importance of public confidence in the integrity of judges stems from the place of the judiciary in the government":

> Unlike the executive or the legislature, the judiciary "has no influence over either the sword or the purse; . . . neither force nor will but merely judgment." The Federalist No. 78, p. 465 (C. Rossiter ed. 1961) (A. Hamilton) (capitalization altered). The judiciary's authority therefore depends in large measure on the public's willingness to respect and follow its decisions. As Justice Frankfurter once put it for the Court, "justice must satisfy the appearance of justice." *Offutt v. United States,* 348 U.S. 11, 14 (1954).

*Williams-Yulee*, 135 S. Ct. at 1666.

The *Williams-Yulee* Court acknowledged that "[t]he concept of public confidence in judicial integrity does not easily reduce to precise definition, nor does it lend itself to proof by documentary record." *Id.* at 1667. Despite the interest's "intangible" character, *id.* at 1671, "no one" could deny "that it is genuine and compelling," *id.* at 1667. The government therefore is on strong footing in invoking that interest here.

2.

Unlike in a public forum, there is no requirement in a nonpublic forum "that the restriction be narrowly tailored" to

advance the government's interests. *Cornelius*, 473 U.S. at 809. Rather, the government's "decision to restrict access to a nonpublic forum need only be *reasonable*," and even then, "it need not be the most reasonable or the only reasonable limitation." *Id.* at 808. Judged by those standards, § 6135, as applied to the Supreme Court plaza, reasonably serves the government's interests in maintaining order and decorum at the Supreme Court and in avoiding the impression that popular opinion and public pressure affect the Court's deliberations.

a.

To begin with, restricting expressive assemblages and displays promotes a setting of decorum and order at the Supreme Court. Congress could reasonably conclude that demonstrations and parades in the plaza, or the display of signs and banners, would compromise the sense of dignity and decorum befitting the entryway to the nation's highest court. A nonpublic forum like the plaza "by definition is not dedicated to general debate or the free exchange of ideas." *Id.* at 811. Instead, "when government property is not dedicated to open communication the government may—without further justification—restrict use to those who participate in the forum's official business." *Perry*, 460 U.S. at 53. Here, the Supreme Court plaza serves as the integrated staging area through which to approach the Supreme Court building and encounter the important work conducted within it. Rather than "restrict use" of the plaza "to those who participate in the [Court's] official business," *id.*, the government grants access to all comers. In doing so, the government does not lose its ability to require visitors to comport themselves in a manner befitting the site's basic function.

The statute also promotes the understanding that the Court resolves the matters before it without regard to political pressure or public opinion. Allowing demonstrations directed at the Court, on the Court's own front terrace, would tend to yield the opposite impression: that of a Court engaged with—and potentially vulnerable to—outside entreaties by the public. At the least, the *appearance* of a Court subject to political pressure might gain increasing hold.

This case illustrates the point. Hodge tells us he wants to use the plaza to send a "political message . . . directed . . . at the Supreme Court" explaining how its decisions "have allowed police misconduct and discrimination against racial minorities to continue." Am. Compl. ¶ 29 (J.A. 12). Congress may act to prevent just those sorts of conspicuous efforts on the courthouse grounds to pressure the Court to change its decision-making—efforts that could well foster an impression of a Court subject to outside influence. Reserving the plaza as a demonstration-free zone counters the sense that it is appropriate to appeal to the Court through means other than "briefs and oral argument." *Grace*, 461 U.S. at 183. It thereby protects the judicial process, and the Supreme Court's unique role within that process, "from being misjudged in the minds of the public." *Cox*, 379 U.S. at 565.

Insofar as the prohibitions of the Assemblages and Display Clauses may reach beyond what is strictly necessary to vindicate those interests, Congress is allowed a degree of latitude in a nonpublic forum. The Supreme Court's admonition that a restriction "need not be the most reasonable or the only reasonable limitation" captures that understanding. *Cornelius*, 473 U.S. at 808. Considered in that light, Hodge reaches too far in arguing that § 6135 is unnecessary because another statute, 18 U.S.C. § 1507, already addresses the government's concerns. Especially when operating under the

relaxed standards applicable in a nonpublic forum, there is nothing "improper in Congress' providing alternative statutory avenues of prosecution to assure the effective protection of one and the same interest." *United States v. O'Brien*, 391 U.S. 367, 380 (1968); *see Initiative & Referendum*, 685 F.3d at 1073.

Section 1507, at any rate, does not fully address Congress's concerns. That statute bars enumerated expressive activities near a courthouse "with the intent of interfering with, obstructing, or impeding the administration of justice, or with the intent of influencing any judge, juror, witness, or court officer." 18 U.S.C. § 1507. It therefore contains a specific-intent requirement not present in § 6135. The latter, unlike the former, accounts for protesters in the Supreme Court plaza who may create the appearance of attempting to influence the Court's deliberations while lacking any subjective intent to do so.

There is also a difference between the two statutes with regard to the interest in maintaining decorum and order within the Supreme Court grounds. Section 1507 is principally addressed to protests directed at judicial business. But people may—and do—wish to use the Supreme Court's front porch as a platform for attracting attention to a wide range of causes, some of which might have no evident connection to the Supreme Court or the administration of justice. And Congress is generally concerned with *any* demonstration, regardless of subject, tending to compromise the decorum and order it seeks to maintain in the Court's grounds. Because the *Grace* Court interpreted § 6135 to reach "almost any sign or leaflet carrying a communication"—including leaflets about "the oppressed peoples of Central America," 461 U.S. at 173, 176—the statute addresses Congress's concerns to an extent that § 1507 likely cannot.

b.

Hodge, echoing the district court, argues not only that the Assemblages and Display Clauses are unreasonably *narrow* in failing to do work not already done by § 1507, but also that the clauses are unreasonably *broad* in prohibiting various conduct in the Supreme Court plaza that should remain permissible. The prohibitions' terms, the latter argument runs, carry the capacity to sweep in a range of expressive activity bearing an inadequate connection to the government's interests. For instance, a solitary, peaceful protester unassumingly holding an inconspicuous sign in the corner of the plaza, perhaps on a day when the Court conducts no business, might seem an unlikely candidate to raise substantial concerns about breaching appropriate decorum in the Supreme Court grounds or engendering a misperception regarding the Court's receptiveness to outside influences.

It is often possible, however, to formulate hypothetical applications of a challenged statute that may call into question the law's efficacy in those discrete instances. But "the validity of [a] regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case." *Ward v. Rock Against Racism*, 491 U.S. 781, 801 (1989). It bears reemphasis in this regard that restrictions of expressive activity in a nonpublic forum need not satisfy any least-restrictive-means threshold, and "a finding of strict incompatibility between the nature of the speech . . . and the functioning of the nonpublic forum is not mandated." *Cornelius*, 473 U.S. at 808-09. Rather, Congress may prophylactically frame prohibitions at a level of generality as long as the lines it draws are reasonable, even if particular applications within those lines would implicate the government's interests to a greater extent than others.

The Supreme Court's recent decision in *Williams-Yulee* affords an illuminating reference point on that score. The petitioner, a former candidate for state judicial office, acknowledged that Florida's interest in preserving the appearance of judicial integrity might justify a ban on individualized, in-person solicitations for campaign contributions. *Williams-Yulee*, 135 S. Ct. at 1670. She argued, though, that Floridians were unlikely to lose confidence in their judiciary as a result of "a letter posted online and distributed via mass mailing" to "a broad audience." *Id.* at 1671. The Supreme Court was unpersuaded. Although Florida's interest "may be implicated to varying degrees in particular contexts," the Court reasoned, the state had "reasonably determined that personal appeals for money by a judicial candidate inherently create an appearance . . . that may cause the public to lose confidence in the integrity of the judiciary." *Id.* "The First Amendment requires" that the law "be narrowly tailored," the Court explained, "not that it be perfectly tailored." *Id.* (internal quotation marks omitted).

If that understanding won the day even when applying "strict scrutiny," *id.* at 1666, it carries even more force when (as in this case) the First Amendment does not call for narrow tailoring. Here, as in *Williams-Yulee*, certain kinds of expressive conduct barred by the Assemblages and Display Clauses "of course . . . raise greater concerns than others." *Id.* at 1671. "But most problems arise in greater and lesser gradations, and the First Amendment does not confine [the government] to addressing evils in their most acute form." *Id.* Congress therefore was under no obligation to fashion § 6135's reach so as to encompass only those forms of expressive activity in the Supreme Court plaza that most acutely implicate the government's concerns. Congress could paint with a broader brush.

The *Williams-Yulee* Court went on to observe, moreover, that the "impossibility of perfect tailoring is especially apparent when the State's compelling interest is as intangible as public confidence in the integrity of the judiciary." *Id.* That same "intangible" interest is at work here. And the alternative interest in maintaining decorum and order likewise forms a "subtle, intangible and nonquantifiable" baseline against which to apply any rigorous tailoring inquiry. *Henderson*, 964 F.2d at 1184.

*Williams-Yulee* highlights the limited utility of attempting to address every conceivable application of § 6135 at the margins. When the heartland of a law's applications furthers the government's interests, the existence of hypothetical applications bearing a lesser connection to those interests does not invalidate the law. "The delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases thus imagined." *United States v. Raines*, 362 U.S. 17, 22 (1960), *quoted in Wash. State Grange*, 552 U.S. at 450. While we are therefore cognizant of the need to keep our judicial imagination in check, we think it warranted to give a measure of attention to the district court's (and Hodge's) concerns with certain hypothetical applications of § 6135 in the Supreme Court plaza, and to explain why those concerns may be borne of an unduly expansive reading of the statute's prohibitions.

We first consider the Assemblages Clause's prohibition against "parad[ing], stand[ing], or mov[ing] in processions or assemblages." 40 U.S.C. § 6135. The district court feared that the clause would criminalize *any* group of people standing together in the Supreme Court plaza. That might include attorneys, tourists, Court employees gathering for lunch, or even a "line of preschool students . . . on their first field trip to the Supreme Court." *Hodge*, 949 F. Supp. 2d at

188. Hodge similarly protests that the clause "is so broad as to cover not only people congregating to engage in expressive activity," but also people "congregating for any other reason." Appellee Br. 6. But insofar as the clause covers congregating for reasons other than expressive activity, those applications to *non*-expressive conduct would raise no First Amendment concern in the first place. In any event, we do not understand the Assemblages Clause to prohibit every instance in which a group of persons stands or moves together in the Supreme Court plaza (nor, for that matter, does the government, *see* Appellants Br. 35-37).

Though the language addresses "standing" and "moving" in an "assemblage," those terms should be understood in the context of the words that surround them. And the surrounding language bespeaks joint conduct that is expressive in nature and aimed to draw attention. The verb "parade" and the noun "procession" connote actions that are purposefully expressive and designed to attract notice. *See Oxford English Dictionary* (online ed. 2015) (definition 1a of "parade": "[t]o march in procession or with great display or ostentation; to walk up and down, promenade, etc., in a public place, esp. in order to be seen; to show off"); *id.* (definition 1a of "procession": [t]he action of a body of people going or marching along in orderly succession in a formal or ceremonial way, esp. as part of a ceremony, festive occasion, or demonstration").

In addition, the Assemblages Clause appears in the same textual sentence as the Display Clause, and the conduct addressed by one naturally informs the reading of the other. The Display Clause plainly involves expressive conduct, fortifying the understanding that its sister clause is analogously addressed to expressive assemblages. Moreover, the Display Clause's modifying phrase "designed or adapted

to bring into public notice" reinforces the statutory focus on conduct meant to attract attention. The more expansive reading contemplated by Hodge, by contrast, would presumably bar a familiar occurrence in the Court's regular course of business: the line of people assembled in the plaza to enter the Court for an oral argument session. There is no reason to construe a prohibition aimed to preserve the plaza for its intended purposes in a manner that would preclude use of the plaza for those very purposes.

We next consider the Display Clause's bar against "display[ing] in the Building and grounds a flag, banner, or device designed or adapted to bring into public notice a party, organization, or movement." 40 U.S.C. § 6135. Again, the *Grace* Court understood that "almost any sign or leaflet carrying a communication . . . would be 'designed or adapted to bring into public notice [a] party, organization, or movement.'" 461 U.S. at 176. Signs or leaflets, as the Court suggested, by nature aim to exhibit or relay the bearer's message to an audience—that is their essential purpose. The inquiry has the potential to become more complicated, however, with respect to certain types of "device[s]." The district court expressed concerns about (what it perceived to be) the government's concession that the Display Clause prohibits "an individual or group [from] . . . wearing t-shirts displaying their school, church, or organization logo" in the Supreme Court plaza. *Hodge*, 949 F. Supp. 2d at 188-89. The government maintains that it never intended to make that concession. It now takes the position that the statute's reference to the "display" of a "device" generally would not apply to the passive bearing of written words or a logo on one's clothing. *See* Appellants Reply Br. 11-13.

We agree. Because the statute speaks in terms of an affirmative act of "displaying" a "device," and because the

other listed mediums of a "flag" or "banner" involve brandishing an object for the purpose of causing others to take note of it, we assume that the "display" of a "device," within the meaning of § 6135, would ordinarily require something more than merely wearing apparel that happens to contain words or symbols. The statute, moreover, not only contemplates an act of display akin to brandishing an object, but also requires a display that is "designed or adapted to *bring into public notice* a party, organization, or movement." 40 U.S.C. § 6135 (emphasis added). The passive bearing of a logo or name on a t-shirt, without more, normally would not cause the public to pause and take notice in the manner presumably intended by § 6135.

Rather, we assume that the Display Clause means to capture essentially the same type of behavior addressed by rules we have considered in the context of open-air national memorials—*i.e.*, "conspicuous expressive act[s] with a propensity to draw onlookers." *Oberwetter*, 639 F.3d at 550. We will not attempt to canvass the various forms of conduct involving clothing that may come within the compass of that description; those cases can await adjudication as they might arise. But a single person's mere wearing of a t-shirt containing words or symbols on the plaza—if there are no attendant circumstances indicating her intention to draw onlookers—generally would not be enough to violate the statute.

c.

With respect to expressive activity that *does* fall within the statute's prohibitions, it is a mark in favor of the statute's reasonableness that the barred activity can be undertaken in an adjacent forum—the sidewalk running along First Street Northeast. The Supreme Court's "decisions have counted it

significant that other available avenues for the . . . exercise [of] First Amendment rights lessen the burden" of a restriction in a nonpublic forum. *Christian Legal Soc'y*, 561 U.S. at 690; *see Oberwetter*, 639 F.3d at 554; *Hotel Emps.*, 311 F.3d at 556. The sidewalk area fronting the Supreme Court along First Street is over fifty feet deep. Dolan Decl. Attach. (J.A. 20). And demonstrations, protests, and other First Amendment activities "regularly occur" there, as is often seen in pictures. *Id.* ¶ 5 (J.A. 17). The public generally must pass through the sidewalk to enter the plaza, moreover, arming someone engaged in expressive activity on the perimeter with exposure to the vast majority of people who go onto the platform.

Hodge makes no argument that the sidewalk in front of the Court is a physically inadequate or less effective forum for communicating his message. Instead, Hodge contends that the sidewalk's availability should count as a strike *against* the statue's reasonableness. He reasons that the adverse effects of First Amendment activity in the plaza would also be felt from the same activity on the adjacent sidewalk, rendering the distinction between the two an unreasonable one. We are unpersuaded.

Once again, the analysis in *Williams-Yulee* is highly instructive. There, the former judicial candidate sought to invalidate Florida's bar against solicitations by candidates themselves on the ground that Florida's allowing solicitations by a candidate's campaign committee essentially raises the same dangers. *Williams-Yulee*, 135 S. Ct. at 1669. In rejecting that argument (and doing so under strict scrutiny), the Court explained: "However similar the two solicitations may be in substance, a State may conclude that they present markedly different appearances to the public." *Id.*

Here, the government could similarly conclude that protests in the Supreme Court plaza and protests on the public sidewalk "present markedly different appearances to the public." In *Grace*, the Court doubted whether the public would view protest activity on the Court's perimeter sidewalks to be more suggestive of the Court's vulnerability to public opinion than if the same activity were conducted on the public sidewalks across the street. 461 U.S. at 183. But that was because there was "nothing to indicate to the public" that the Court's perimeter sidewalks "are part of the Supreme Court grounds or are in any way different from other public sidewalks." *Id.* The opposite is true of the raised marble plaza, as we have explained. For that reason, Congress could conclude that the public might form a different impression about the Court's susceptibility to public opinion if it saw a Court seemingly inviting demonstrators onto its own front porch (as opposed to a Court tolerating demonstrators on a public sidewalk "indistinguishable from any other sidewalks in Washington, D.C.," *id.* at 179).

\* \* \*

In the end, unless demonstrations are to be freely allowed inside the Supreme Court building itself, a line must be drawn somewhere along the route from the street to the Court's front entrance. But where? At the front doors themselves? At the edge of the portico? At the bottom of the stairs ascending from the plaza to the portico? Or perhaps somewhere in the middle of the plaza? Among the options, it is fully reasonable for that line to be fixed at the point one leaves the concrete public sidewalk and enters the marble steps to the Court's plaza, where the "physical and symbolic pathway to [the] chamber begins." Scott & Lee, *supra*, at 138.

Of course, this case would be decidedly different if the line—wherever exactly it lay—were geared to shield the Supreme Court from having to face criticism just outside its own front door. A law that discriminated on the basis of viewpoint in that way would plainly infringe the First Amendment even in a nonpublic forum. Section 6135, however, bans demonstrations and displays in the plaza regardless of whether they support or oppose (or even concern) the Court.

The statute requires that result because *all* demonstrations on the Court's front porch—even those seeking to give the Court a pat on the back, not a slap in the face—could fuel the impression of a Court responsive to public opinion or outside influence, and could compromise the decorum and order suitable in the entryway to a courthouse, the nation's highest. But demonstrations can take place on the adjacent public sidewalk, where the concerns justifying the statute's restrictions of speech are not as much in evidence. For all those reasons, § 6135 is a reasonable, viewpoint-neutral—and thus permissible—means of vindicating the government's important interests in the Supreme Court plaza.

## IV.

In addition to his claim that § 6135 amounts to an unreasonable restriction on First Amendment activity on public property, Hodge also asserts a First Amendment overbreadth claim as a separate basis for across-the-board invalidation of the statute as to the plaza. The overbreadth doctrine, traditionally understood, amounts to an exception to the general rule against third-party standing. *See Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003); *Broadrick v. Oklahoma*, 413 U.S. 601, 611-12 (1973). Because overbroad laws have a chilling effect, potential speakers who could assert successful

challenges to the law's application against them might instead refrain from speaking at all.  Recognizing that possibility, the overbreadth doctrine enables a person whose activity validly falls within the challenged law's scope to make a First Amendment argument on behalf of those who might engage in protected speech but for the law's chilling effect.  *See Hicks*, 539 U.S. at 119.

This, however, is not such a case.  Hodge never argues that § 6135 may be constitutionally applied to his own conduct but is unconstitutional in its application to the protected speech of others.  Instead, he contends that § 6135 cannot be applied to anyone (including himself) in the Supreme Court plaza, because the law curtails too much speech in light of the government's underlying interests.  Descriptively, that is indeed an argument that the law is "overly broad."  But we have already addressed the substance of that argument in evaluating the reasonableness of § 6135's restrictions on speech in light of the purposes of the forum.  Having concluded that the government's means-ends fit is reasonable, we see no viable avenue for concluding nonetheless that § 6135 has too many unconstitutional applications to survive.

We therefore decline to run what would amount to the same analysis a second time.  Our approach breaks no new ground.  In *Bryant v. Gates*, 532 F.3d 888 (D.C. Cir. 2008), the plaintiff brought an overbreadth claim alongside a challenge to a speech restriction in a government forum.  *Id.* at 894 & n.**.  In that case, as here, we upheld the challenged regulation as a reasonable measure in a nonpublic forum.  *Id.* at 894-98.  We noted that the plaintiff "separately claim[ed]" that the regulation was "unconstitutionally overbroad." *Id.* at 894 n.**.  But we declined to "address that claim separately" because it was "analytically identical to [the] claim" of an

invalid restriction of speech in a government forum. *Id.* We face the same situation here, and we follow the same course.

V.

Hodge advances an additional claim seeking across-the-board invalidation of § 6135's application to the Supreme Court plaza: statutory vagueness. The district court, having found the statute unconstitutional on other grounds, did not reach Hodge's vagueness challenge. *See Hodge*, 949 F. Supp. 2d at 197 n.37. Hodge nonetheless presses his vagueness claim on appeal as an alternative basis for affirming the district court's judgment. While we generally refrain from considering an issue not passed upon below, the "matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals." *Singleton v. Wulff*, 428 U.S. 106, 120-21 (1976). Here, we find it appropriate to consider Hodge's vagueness claim. Not only does he ask us to address the challenge, but it raises pure questions of law. And the government joins issue with Hodge's arguments on the merits rather than suggesting that we forbear from resolving the matter.

"Vagueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment." *United States v. Williams*, 553 U.S. 285, 304 (2008). "A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.* Hodge puts forth various arguments urging that the terms of § 6135 suffer from one or both of those failings.

Significantly, however, Hodge makes no claim that the statute is vague with respect to its coverage of his *own*

conduct—either his act of displaying a sign that led to his arrest or the additional expressive acts he intends to carry out in the plaza in the future. His vagueness claim thus runs up against "the rule that '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010) (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982)). "That rule," the Supreme Court has explained, "makes no exception for conduct in the form of speech." *Id.* As a result, "even to the extent a heightened vagueness standard applies" to statutes prohibiting speech, "a plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim under the Due Process Clause of the Fifth Amendment for lack of notice." *Id.*

Here, the bulk of Hodge's vagueness arguments fit in the "lack of notice" category (*i.e.*, claims that the statute "fails to provide . . . fair notice of what is prohibited," as opposed to claims that the statute "is so standardless that it authorizes or encourages seriously discriminatory enforcement," *Williams*, 553 U.S. at 304). The sole exception is Hodge's argument that the Assemblages Clause reaches so broadly that it leaves too much "discretion to law enforcement to determine which assemblages and processions to allow and which to prohibit." Appellee Br. 38. That argument, however, rests on the premise that the Assemblages Clause pertains to *any* circumstance in which multiple persons stand or participate in some sort of procession in the plaza, regardless of whether they are engaged in expressive activity. Because we have already rejected that premise, Part III.B.2.b, *supra*, Hodge's vagueness argument on this score necessarily fails. His remaining vagueness arguments as to the Assemblages

Clause, including those sounding in "fair notice," rest on the same flawed premise.

With regard to the Display Clause, Hodge sees unconstitutional vagueness in the terms "flag, banner, or device," as well as in the phrase "bring into public notice a party, organization, or movement." 40 U.S.C. § 6135. Again, Hodge makes no argument that it is unclear whether his carrying of signs and distribution of leaflets are prohibited, nor whether his conveying a "political message" about police misconduct and racial discrimination would qualify. *See* Am. Compl. ¶ 29 (J.A. 12). Because his arguments instead rest on the lack of fair notice as to the conduct of others, they seemingly come within the rule generally barring the assertion of a Fifth Amendment vagueness claim by someone to whom the challenged statute unambiguously applies. *See Humanitarian Law Project*, 561 U.S. at 20. In *United States v. Williams*, however, the Supreme Court engaged with a fair-notice vagueness claim against a statute criminalizing speech even though the claim was premised on the scope of the law's applicability to hypothetical persons not before the Court rather than to the defendant himself. *See* 553 U.S. at 304-07. We have no need here to examine precisely when, and to what extent, there remains room to bring those sorts of vagueness claims. Regardless, Hodge's challenges to the Display Clause fail on the merits.

The Display Clause's language does not "fail[] to provide a person of ordinary intelligence fair notice of what is prohibited." *Id.* at 304. The words "flag, banner, or device" do not call for "wholly subjective judgments"—unlike terms such as "annoying" or "indecent," which yield "indeterminacy" of a kind occasioning invalidation on vagueness grounds. *Id.* at 306. Of course, there might be cases in which there is some ambiguity about the statute's

applicability—whether the circumstances involve a "device," for instance. But as we have explained, the reference to "device" takes meaning from the adjacent terms "flag" and "banner," connoting brandishing of an object in a manner aimed to cause others to take note of it. *Supra* pp. 39-40. And in any event, "[c]lose cases can be imagined under virtually any statute," and it is a "mistake" to "belie[ve] that the mere fact that close cases can be envisioned renders a statute vague." *Williams*, 553 U.S. at 305-06.

The phrase "designed or adapted to bring into public notice a party, organization, or movement" also lies well outside the territory of "wholly subjective judgments." Hodge contends that the statute is ambiguous as to whether it covers displays communicating "any expression of views, regardless of whether the message is associated with an identifiable party, organization, or movement." Appellee Br. 43. But that alleged ambiguity, even assuming it would raise Fifth Amendment vagueness concerns, was resolved in *Grace*. The Supreme Court held that "almost any sign or leaflet carrying a communication"—including Zywicki's leaflets concerning judicial tenure and foreign human rights issues and Grace's sign displaying the First Amendment's text—would "be 'designed or adapted to bring into public notice [a] party, organization, or movement.'" 461 U.S. at 176. The Court thus rejected the position advanced by Justice Stevens that Grace's conduct fell outside the Display Clause because a "typical passerby could not, merely by observing her sign, confidently link her with any specific party, organization, or 'movement.'" *Id.* at 188 (Stevens, J., concurring in part and dissenting in part). Hodge evidently thinks that Justice Stevens had the better view, *see* Appellee Br. 43, but that is not a viable argument about the present indeterminacy of the phrase.

We therefore find Hodge's vagueness challenge to be without merit.

\*    \*    \*    \*    \*

For the foregoing reasons, we reverse the judgment of the district court.

*So ordered.*